(85 App. Div. 254.)

### ROCKEFELLER v. LAMORA.

(Supreme Court, Appellate Division, Third Department. June 30, 1903.)

1. FISH—PRIVATE PARK LAW—TRESPASS—EXEMPLARY DAMAGES.
   Laws 1892, p. 1000, c. 488, art. 9, as amended by Laws 1896, p. 264, c. 319, § 212, permits establishment of private parks for propagation or protection of fish or game, by landowners, on publication of intention, etc., provided that all waters heretofore stocked by the state, or which may hereafter be stocked by the state, at the expense of the state, shall be open to the public to fish therein as though the private park law had never existed, but that nothing in the act shall be construed as affecting any existing rights of persons owning lands or holding leases of private grounds, waters, or parks prior to the passage of the act. Section 215 declares it a misdemeanor to disturb such parks, and subjects the offender to exemplary damages, in addition to the actual damages. *Held* that, plaintiff having established such private park, defendant was not entitled to fish therein, on proof that a third person, not the owner, had without his consent stocked the waters of such land with fish procured from the state fish and game commissioners, with knowledge on their part as to what waters were to be stocked.

Appeal from Franklin County Court.

Proceedings by William Rockefeller against Oliver Lamora for exemplary damages for fishing on plaintiff's premises. From a judgment dismissing the complaint, and from an order denying a new trial, plaintiff appeals. Reversed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Kellas & Genaway, for appellant.
Saunders & Saunders, for respondent.

HOUGHTON, J. The plaintiff is the owner of about 50,000 acres of Adirondack forest lands, being the greater portion of townships 16 and 17, in great tract No. 1 of Macomb's Purchase, in the southern

part of Franklin county. The St. Regis river, which flows north-westerly into the St. Lawrence, has its source, in three branches, in this vicinity. What is termed the "Middle Branch" rises in the St. Regis Lakes, situate in township 18, which joins township 17 on the east, and flows for several miles through the plaintiff's lands. On the easterly side of township 17 is a considerable body of water, known as "Fallensby Junior Pond." Its inlet is from Slush Pond, situate on the westerly borders of township 18, and its outlet empties into the Middle Branch of the St. Regis river on plaintiff's land. In the southwest part of the township is a pond known as "Bay Pond," the outlet of which flows into the West Branch of the St. Regis river, which does not join the Middle Branch for many miles after leaving the territory owned by the plaintiff. In the northeast part is lo-cated Quebec Pond, the outlet being Quebec Brook, which flows northerly off the lands of plaintiff, and eventually joins the Middle Branch a considerable distance beyond the borders of his tract. A small tributary, known as "McCollum's Brook," rising in another township, empties into Quebec Brook just south of the north line of township 17. The plaintiff completed the acquisition of his lands in the spring of 1899, and immediately began the establishment of them as a private park for the protection or propagation of fish, birds, and game, by the publishing and posting of the notices provided by article 9 of the forest, fish, and game law as then existing. Laws 1892, p. 1000, c. 488. Since that time the entire tract, except about 25 acres cleared for a camp near Bay Pond, has been devoted to the uses of a fish and game preserve. The plaintiff engaged, and has kept employed, men to look after his lands and to preserve them from trespass. English deer were imported and turned loose amongst the native deer, both of which have been fed during the winter when occasion required. Fish, birds, and deer have largely increased since the establishment of the park.

In April and May, 1902, the defendant, on three several occasions, entered upon the plaintiff's lands and fished in the Middle Branch of the St. Regis river. He knew of the published and posted notices, and, in addition, had been warned by the plaintiff's keepers not to fish upon the plaintiff's lands, because it was a private park. He caught and carried away a number of trout on each occasion. The plaintiff thereupon brought action in justice's court against him, to recover the penalty, in the form of exemplary damages, prescribed in section 203 of the forest, fish, and game law. The defendant justi-fied his trespass on the ground that the waters on and running through the plaintiff's lands and pretended park had been stocked with fish by the state, and that hence the plaintiff had no right of ac-tion for the penalty in the form of exemplary damages against a cit-izen fishing in such waters. That action resulted in a judgment for the defendant, and the plaintiff appealed to the County Court of Franklin county for a new trial, which resulted in a direction of a verdict for the defendant at the close of the evidence, and it is from that judgment that the plaintiff appeals.

On that trial the plaintiff established the facts hereinbefore stated, and the defendant sought to prove the stocking of the waters by the

state in justification of his acts.   Errors were committed on the trial
in the admission of unproved documents and letters, but this court
puts its decision on broader grounds.   The vast sums of money ex-
pended by individuals and clubs in establishing and preserving private
parks in the Adirondacks, and the great interest which the citizens
of the state have in their rights to the pursuit of pleasure and health
in that region, demand from the court a broad interpretation of the
law.   The provision of law with respect to establishing private parks,
in force in 1899, contained in section 212 (Laws 1896, p. 264, c. 319)
the following limitation:

"Provided, however, that all waters heretofore stocked by the state, or
which may hereafter be stocked by the state from any of the hatcheries,
hatching stations, or by fish furnished at the expense of the state, shall be
and remain open to the public to fish therein the same as though the private
park law had never existed.   But nothing herein contained shall be construed
as affecting any rights now existing of persons owning lands or holding leases
of private grounds, waters or parks prior to the passage of this act."

For the purposes of the discussion of the case, it will be assumed
that the defendant proved that the witness Dwight, between the years
1891 and 1894, not being the owner of the lands or having any fish-
ing rights in the streams, and without the consent of the owners,
stocked the inlet of Fallensby Junior Pond with speckled trout fry
procured by him from the state hatchery and hatched at the state's
expense, and that he also stocked, in the same manner, with lake trout
and speckled trout fry, the inlet of Bay Pond, and that such fish were
furnished by the state fish and game commission, on his request, they
knowing where they were to be placed; also that the witness Mc-
Neil stocked, before 1899, McCullom's Brook with speckled trout
fry, under the same circumstances and under the same conditions.
This state of facts did not, we think, justify the defendant in his tres-
pass, nor authorize the court to direct a verdict in his favor.

It will throw light on what the Legislature could do, and intended
to do in the passage of the parking law, to investigate the right of
the individual owners of the land and the people at large.   As early
as the Year Books it was the common law of England that a right to
take fish belonged so essentially to the right of soil in streams where
the tide did not ebb and flow that, if the riparian proprietor owned
upon both sides the stream, no one but himself might come within the
limits of his land and take fish therefrom.   And the same rule applied
so far as his land extended, to wit, to the thread of the stream, where
he owned only upon one side.   Within these limits his right of fishery
was held to be sole and exclusive.   Washburn's Easements and Servi-
tudes, 411.   The right to hawk, hunt, fish, and fowl was held to be
such an interest in land that, if it was intended to be more than a pres-
ent personal privilege, it must be evidenced by a grant.   Wickham v.
Hawker, 7 Mees. & Wels. 63.   And this interest thus acquired was
such that the owner of the fishery upon the land of another might
maintain action for trespass.   Holford v. Bailey, 13 Adol. & El. 425.
The soil of navigable tidal rivers, so far as the tide ebbs and flows,
was prima facie in the crown, and the right of fishery therein was
prima facie in the public.   But the right to exclude the public there-

from, and to create a several fishery, without grant of the land, existed in the crown, and might lawfully have been exercised by the crown before Magna Charta, and could be made the subject of a grant by the crown to a private individual. Malcolmson v. O'Dea, 10 H. L. Cas. 593. Notwithstanding Magna Charta, the king still retained the right to grant the soil under navigable waters, and with it the exclusive right of fishery. And this right, exercised through the colonial governor and assembly, has been recognized by our courts in confirming the title of the town of Brookhaven, and other towns on Long Island, to the exclusive right of fishery even in an arm of the sea. Trustees of Brookhaven v. Strong, 60 N. Y. 56; Hand v. Newton, 92 N. Y. 88; Rogers v. Jones, 1 Wend. 237, 19 Am. Dec. 493; Robins v. Ackerly, 91 N. Y. 98.

In this country the state has succeeded to all the rights of both crown and parliament in navigable waters and the soil under them. In England, Parliament had complete control over all the navigable waters within the kingdom. It could regulate navigation upon them, and could authorize exclusive rights and privileges of navigation and fishing. Langdon v. Mayor, etc., of City of New York, 93 N. Y. 155. The state, through its Legislature, may exercise the same power which, previous to the Revolution, could have been exercised by the king alone, or by him in conjunction with Parliament, subject, only, to those restrictions which have been imposed by the Constitution of the state and the United States. Lansing v. Smith, 4 Wend. 9, 21 Am. Dec. 89. It is probable that section 18 of article 3 of the Constitution would prohibit the Legislature from granting to any individual or association the exclusive right of fishery in any of the navigable waters of the state; for such a grant would be in the nature of an exclusive privilege or franchise. Slingerland v. International Contracting Co., 43 App. Div. 223, 60 N. Y. Supp. 12. And if the state had any title to the fish, birds, and game on private lands, the Legislature could not give away that title to an individual or association seeking to park a particular territory. Doubtless, the Legislature had something of this in mind when it repealed chapter 623, p. 835, of the Laws of 1887, which provided that, when any territory should be dedicated and designated as a private park, all fish, birds, and game should become the property of the owner, or the person or corporation having the exclusive right to shoot, hunt, or fish thereon. But such a grant was not a necessity, for the proprietors of the soil through which nonnavigable streams flow have the exclusive right of fishing.

As early as the case of Hooker v. Cummings, 20 Johns. 90, 11 Am. Dec. 249, it was held that in all rivers of the state, not navigable in the sense that the tide ebbs and flows (except the Hudson and Mohawk rivers, to which a different rule has been applied by reason of the terms of the grants), the proprietors of the soil through which a stream flows have the exclusive right of fishing therein; applying the rules of the common law of England to their full extent in that regard. This case has been often cited with approval, and has become one of the leading cases illustrating the rights of riparian owners. In Chenango Bridge Co. v. Paige, 83 N. Y. 178, 38 Am. Rep. 407, the doctrine is reiterated that the bed and banks of a fresh-water river, where

the tide does not ebb and flow, are the property of the riparian proprietor, who may use the land or water of the river in any way not inconsistent with the easements of the public for passage, as on a public highway.   In Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393, it is said that the Legislature has no more power over fresh-water streams of this character than over other private property, except for the purpose of regulating, preserving, and protecting the public easements.

In the present case there is no claim that the Middle Branch of the St. Regis river is navigable for any purpose or in any sense.   The plaintiff is the owner of the soil on both sides of the stream, and of its bed, as well as of the various ponds and streams which are claimed to have been stocked with fish from the state hatcheries.   Further citation of authority and illustration that, when the plaintiff became the purchaser of the land and the beds of the streams and ponds, he prima facie had the exclusive right of fishery therein, is futile and unnecessary.

What, then, was the intent of the Legislature in enacting the parking law?   Clearly, we think, only to give one complying with its terms protection to his private rights, and the right to recover a penalty in the form of exemplary damages, in addition to the actual damage sustained by trespass.   Article 9, c. 488, p. 1000, of the Laws of 1892, as amended by chapter 319, p. 264, of the Laws of 1896, being the law in force when the plaintiff established his park, provided as follows:

"Sec. 212. Laying Out Grounds for Private Parks.—A person owning or having the exclusive right to shoot, hunt or fish on lands, or lands and water, desiring to devote such lands or lands and water, to the propagation or protection of fish, birds or game shall publish in a newspaper printed in the county within which such land or lands and water are situate a notice, once a week for a term not less than four weeks, in the county where the lands so described are situated, substantially describing the same and containing a clause declaring that such land or lands and water will be used as a private park for the purpose of propagating and protecting fish, birds and game: provided, however, that all waters heretofore stocked by the state or which may hereafter be stocked by the state from any of the hatcheries, hatching stations, or by fish furnished at the expense of the state, shall be and remain open to the public to fish therein as though the private park law had never existed.   But nothing herein contained shall be construed as affecting any rights now existing of persons owning lands or holding leases of private grounds, waters or parks prior to the passage of this act."

Other sections of the article provided the kind of notices and manner of posting upon the land, and then followed section 215 (page 1001), which provided as follows:

"Sec. 215. Fish or Game so Protected not to be Interfered with.—Upon compliance with the foregoing provisions for preventing trespassing or for devoting lands to propagation of fish, birds and game, no persons shall disturb or interfere in any way with the fish or wild birds or wild animals while on the premises so protected, except with the consent of the owner or person having the exclusive right to shoot, hunt or fish thereon.   Whoever shall violate or attempt to violate the provisions of this section shall be deemed guilty of a misdemeanor, and shall, in addition thereto, be subject to exemplary damages in an amount not less than fifteen dollars, nor more than twenty-five dollars, in addition to the actual damages sustained by the owner or lessee."

The act did not purport to give the owners of the lands and streams the right to fish and hunt on their own premises. They had that already, and they had the common-law action for trespass against any intruder. It is not questioned but what the Legislature could give the right to increased damages for the doing of certain acts, if it saw fit. The provision for treble damages for cutting and despoiling trees upon the lands of another, and for forcible entry and detainer, was a part of the Revised Statutes before the enactment of the Code, and the power of the Legislature in that regard has never been doubted. It may be said, too, that the Legislature had in mind some public benefit to be derived from the establishment and preservation of private parks. The law was passed at the beginning of the agitation for a forest preserve, the primary object of which was to protect the wild lands of the state from devastation, and thereby preserve the waterways of the state. Game preserves could be established only in mountainous regions, and the protection of timber is a necessity to their continuance.

There was saved to the state, to remain open to the public, all waters theretofore stocked by the state, or by fish furnished at the expense of the state, or which might thereafter be stocked; and it is under this provision that the defendant attempts to justify his trespass. But how stocked? The Legislature could not authorize the state fish commissioners to enter upon a man's private fishery, without his knowledge and consent, and deposit therein fish hatched by the state, and thus convert his property to public use and destroy his private rights. This would be the taking of private property for public use without just compensation. One might own a tract of thousands of acres, practically valueless as timber land or for agricultural purposes, and yet of very great value for the establishment of a private park. The defendant contends that the Legislature intended to provide that the act of a stranger, in conjunction with the determination to stock of the fish and game commission, in depositing a few fish hatched at the state's expense in one of the streams on lands of an individual or corporation, should have the effect of dedicating to the public an entire territory, the water stocked, as well as all other waters on the lands, and that the owner and his grantees would be thereafter debarred from converting it into a valuable private park. This would be a more complete destruction of riparian rights than the declaring of a stream a public highway for the floating of logs, without adequate compensation, which the courts have uniformly condemned. De Camp v. Dix, 159 N. Y. 436, 54 N. E. 63; Brewster v. Rogers Co., 169 N. Y. 73, 62 N. E. 164, 58 L. R. A. 495. The owner of a stream could doubtless dedicate it to the public use, as he could his lands to a public highway; but this imports consent on his part, and a bargain entered into between him and the public authorities.

Nor do we think that if one pond or stream on a tract of land should be so dedicated to the public, by the owner consenting that it be stocked by the state, the owner would thereby dedicate to the public all the other separate streams and ponds which might be on all the land that he owned. It is true that fish, at certain seasons

of the year, pass from one portion of the stream to another. Trout fry placed in a small tributary, as they obtain greater size, work to the main stream, and so up that stream, and may never go back to the original water in which they were placed. But this does not constitute a stocking of the main stream. The language of the statute is, "all waters heretofore stocked." In common parlance, the use of the term "waters," as applied to various lakes, streams, and ponds on a tract of land, imports a designation of them in severalty; and in such sense we think the term is used in the statute. Our interpretation of the statute is that the stocking of streams and waters, the beds and adjacent lands of which are owned by an individual or corporation, in order to give the right to the public to fish therein, must be with the consent of the owner or one having a right of fishery therein, and that only the particular stream, lake, or pond thus stocked is so made public, and that such stocking does not open to the public streams to which they may be tributary, and that this stocking of such a stream by owners above or below does not have the effect of opening to the public that part of the stream situated on lands of an owner who has not consented to such dedication, and that the public is not permitted to follow the migrations of the fish, and take them in that part of the stream on private lands, without the owner's consent.

It is urged that the various laws enacted by the Legislature, with respect to the time and manner of taking various kinds of fish and game, are inconsistent with this interpretation of the law. There is nothing inconsistent between this public regulation and the rights of individual owners. The power resides in the several states to regulate and control the right of fishing in the public waters within their respective jurisdictions. Lawton v. Steele, 119 N. Y. 234, 23 N. E. 878, 7 L. R. A. 134, 16 Am. St. Rep. 813. Fish and game are migratory, and those which may now be on private lands may quickly change their location to public lands and public waters. No man owns wild game or fish, even though they be on his land, unless he has reduced them to his possession by capture. If they wander from his premises to those of the public or another, he may not complain of their taking. In public waters and on public lands, this right is open to all alike, and no individual right is trespassed upon by so doing. Fish, especially, form a large source of food supply, and those which propagate upon private property and migrate to public waters may constitute a considerable proportion. That they may not be disturbed in propagation, the regulation of the manner and time of their killing is, therefore, a proper subject of legislative action. As was said by Chief Justice Spencer, in Hooker v. Cummings, supra:

"These acts prove nothing; for the Legislature have, confessedly, the right of regulating the taking of fish in private waters, and do every year pass laws for that purpose, as to rivers not navigable in any sense, and which are unquestionably private property."

We have not overlooked the case of People v. Hall, 8 App. Div. 15, 40 N. Y. Supp. 183, urged upon our consideration by the defendant's counsel. There were many reasons in that case which called

for a reversal of the judgment convicting the defendant of the mis-
demeanor provided by the game law, and the determination of the
court could have well been put on those grounds alone. We are
forced to disagree with that portion of the opinion which intimates
that a private park cannot be maintained under the statute, unless
proof is given that animals and fish were actually bred and propagated
thereon. The language of the statute is:

"Devote such lands, or lands and water, to the propagation or protection
of fish, birds or game."

It is well known that when fish and game are protected they propa-
gate rapidly. In the present case the proof is that both have very
largely increased since the establishment of the park. A protection
which allows natural propagation, we think, meets the requirement of
the statute. We are mindful that this interpretation deprives the
public at large, by the infliction of severe penalties for infraction of
the law, of the pleasure and profit of fishing and hunting in a very
large portion of the Adirondack forest, and gives to men of great
wealth, who can buy vast tracts of land, great protection in the enjoy-
ment of their private privileges. The wisdom of the Legislature in
prescribing exemplary damages, and making fishing and hunting upon
private parks a misdemeanor, is not for the court to review. It was
within its province to do so if it saw fit. Exemplary damages are no
new thing for willful conduct, and the Legislature is constantly en-
acting that certain willful injuries shall be deemed misdemeanors.

The burden was on the defendant to show that the stream in which
he fished had been dedicated to the public. The plaintiff being the
owner of the land through which it flowed, it was prima facie private
property, and, upon the plaintiff showing compliance with the statute,
he was presumptively entitled to recover. There was no proof that
the stream in which the defendant was fishing had been, in contempla-
tion of law, stocked by the state. He failed, therefore, to justify his
acts, and by them incurred liability for the penalty in the form of ex-
emplary damages, provided by the statute.

The judgment must be reversed, and a new trial granted, with costs
to abide the event. All concur.

---

(85 App. Div. 204.)

### MURTAUGH v. DEMPSEY.

(Supreme Court, Appellate Division, Third Department. June 30, 1903.)

2. LANDLORD—LIABILITY FOR REPAIRS—EVIDENCE.
       In an action by a materialman against the owner of a building, who
   had contracted to pay for material to be used by the tenant for repairs,
   in which it appeared that the landlord required that the material be