[No. 4912.]

HARTMAN v. TRESISE.

1.  **Constitutional Law—Public Waters—Natural Streams—Right
    of Fishery—Trespass.**

    Section 5, art. 16, of the constitution of Colorado, declares the
    unappropriated waters of our natural streams to be the property
    of the public, and dedicates the same to the use of the people of
    the state, subject to appropriation, as in that instrument pro-
    vided; and the following section provides that the right to divert
    the same to beneficial uses shall never be denied.  It is this
    right of appropriation which the general government has recog-
    nized and confirmed, and subject to which its grants of the public
    lands in the arid states since 1866 have been made; but neither
    in this, nor in any other, clause of our constitution, nor in any
    act of congress, is the right of fishery in the natural streams
    in this state, or an easement over the public domain for its
    enjoyment, declared to be, or recognized as vested, in the state;
    nor has any authority to grant the same to its citizens been
    conferred upon the state.—P. 149.

2.  **Same—Enabling Act—Irrevocable Ordinance—Public Domain.**

    Whatever right this state might have exercised in dispos-
    ing of the public domain was relinquished by our enabling act,
    1 Mills' Ann. Stats., pp. 90, 91 and 109, which specifically provides
    that one of the conditions precedent to our right to form a state,
    was to disclaim by irrevocable ordinance all right and title to
    public lands within the territory, and to expressly recognize the
    exclusive right of congress to dispose of the same; and this right
    and title of the United States passed to plaintiff unless excepted
    or reserved in the instrument of conveyance, or by some act of
    congress; but no act of congress authorized, nor did plaintiff's
    patent contain, any reservation of any public right of fishery, or
    of any easement over his lands to enable the public to enjoy
    the same.—P. 150.

3. **Common Law—Non-navigable Fresh Water Streams—Right
   of Fishery.**

As between those claiming public right of fishery and private
right of fishery, the doctrine of the common law that the owner
of lands which border on a navigable river above the ebb and
flow of the tide, and the owner of the lands along the non-
navigable fresh water streams, as an incident of such ownership,
owns the bed of the stream and the exclusive right therein to
the middle thereof; and if he owns the lands bordering on both
sides, he has the exclusive right of fishing in the entire stream
to the extent that it flows through his lands, applies in Colorado
in accordance with Gen. St. 1883, §197, providing that the com-
mon law of England shall be the rule of decision, and shall be
considered as of full force until repealed by legislative authority.
—P. 151.

4. **Constitutional Law—Natural Streams—Right of Fishery—
   Eminent Domain.**

Colo. Sess. laws, 1903, p. 233, c. 112, providing, "that the
public shall have the right to fish in any stream in this state,
stocked at public expense, subject to actions in trespass for
any damage done property along the bank of any such stream,"
is in contravention of §15, art. 2, of the constitution, prohibiting
the taking of private property for private or public use without
just compensation, in so far as it attempts to make lawful a
trespass by one man on the lands of another, and is clearly in
conflict with the laws of congress relating to the disposition of
the public domain.—P. 152.

*Appeal from the District Court of Gunnison County.
Hon. Theron Stevens, Judge.*

Action by A. Hartman against George Tresise.
From a judgment in favor of defendant, plaintiff
appeals.  Decision *en banc*.          *Reversed*.

CHIEF JUSTICE GABBERT, Mr. JUSTICE GODDARD
and Mr. JUSTICE MAXWELL concur.

Mr. JUSTICE GUNTER concurs specially.

Mr. JUSTICE STEELE and Mr. JUSTICE BAILEY
dissent.

Mr. SPRIGG SHACKLEFORD, for appellant.

Mr. N. C. MILLER, attorney general, and Mr. I. B. MELVILLE, assistant attorney general, for the state.

Mr. D. C. BEAMAN, Mr. CHARLES D. HAYT, Mr. JOHN A. GORDON, Mr. RALPH TALBOT, and Messrs. WARD & WARD, *amici curiae.*

Action against defendant for breaking and entering plaintiff's close. Plaintiff is the owner, and in possession, of cultivated lands which were patented after our state government was organized. They were enclosed by a fence and posted as required by law. Defendant, a citizen of Colorado, forcibly broke and entered thereupon, knowing of the posting, and having previously been personally notified by plaintiff not to enter the same, or fish in the natural stream which flowed therethrough and had been stocked with fish at the public expense. Defendant's sole purpose in making the entry was to fish in such stream, which he succeeded in doing. He justifies, under section 5 of article 16 of the constitution, which reads: "The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided"; and under an act of the general assembly, Session Laws 1903, page 233, which provides: "That the public shall have the right to fish in any stream in this state, stocked at public expense, subject to actions in trespass for any damage done property along the bank of any such stream."

The district court dismissed the action, upon the ground that citizens of this state have the constitutional and statutory right to fish in our natural streams, against the wish and protest of the owner of the land through which the streams flow, when

the waters thereof have been stocked with fish at public expense. In announcing the decision the district judge said: "The ratification of this constitution by the United States government amounted to a declaration on the part of the government that the state should have a perpetual easement over the public lands of the United States for the natural streams contemplated by the constitution, of which these streams were a part, and that all persons acquiring a part of the public domain acquired the same, subject to this constitutional provision and this right of the state." It was therefore held that "defendant, as one of the citizens of this state, was only exercising the right granted to him by the general assembly under the constitution."

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

The conclusion reached by the trial court is not tenable. The section of the constitution relied upon declares the unappropriated waters of our natural streams to be the property of the public, and dedicates the same to the use of the people of the state, subject to appropriation, as in that instrument provided; and the following section provides that the right to divert the same to beneficial uses shall never be denied. It is this right of appropriation which the general government has recognized and confirmed, and subject to which its grants of public lands in the arid states since 1866 have been made. But neither in this nor in any other clause of our constitution, nor in any act of congress, is the right of fishery in the natural streams of this state, or an easement over the public domain for its enjoyment, declared to be, or recognized as vested in the state; nor has any authority to grant the same to its citizens been conferred upon the state or claimed by it,

except in the statute cited. This does assume to grant such right, and it is upon this alone, if at all, that defendant can justify. That this act is void for at least two reasons, we proceed to show.

If the state, when formed, might have exercised authority in disposing of the public domain therein situate, it was relinquished, for, in our enabling act, 1 Mills' Ann. Stats., pages 90, 91, 109, it was specifically provided, as one of the conditions precedent to the right of the people of our territory to form a state, that they should, and complying therewith they did, by irrevocable ordinance, disclaim all right and title to public lands within the territory, and expressly recognized the exclusive right of congress to dispose of the same. That congress has such exclusive right has been expressly decided.—*Wilcox v. Jackson,* 13 Peters, *517.

When our constitution was adopted, the United States owned the lands which, after ratification, it conveyed to the plaintiff. Whatever rights and title therein it owned passed to the plaintiff, unless excepted or reserved in the instrument of conveyance, or by some act of congress. Plaintiff took and held the same, subject, of course, to the right of appropriation just noted, and he holds it subject, also, to the state taxation laws, the laws of eminent domain and other statutory regulations, to which the owners of all property are amenable. But the power of the state is not so comprehensive as to enable it, without compensation to the owner of lands, to take any part of them from him and give them to another citizen, and no act of congress authorized, nor did plaintiff's patent contain, any reservation of any public right of fishery, or of any easement over his lands to enable the public to enjoy such right.

Defendant concedes that, at the common law—and the authorities so hold—the owner of lands

which border on a navigable river, above the ebb and flow of the tide, and the owner of lands along a non-navigable fresh water stream, as an incident of such ownership, owns the bed of the stream and the exclusive right of fishery therein to the middle thereof; and if he owns the land bordering upon both sides, he has the exclusive right of fishing in the entire stream, to the extent that it flows through his lands.—*Holyoke Co. v. Lyman*, 15 Wall. 500; 13 Am. & Eng. Enc. Law (2d ed.) 565 *et seq.; New England Trout Club v. Mather*, 68 Vt. 338; *Albright v. Cortright*, 64 N. J. Law 330; *Rockefeller v. Lamora*, 83 N. Y. Supp. 289; *Griffith v. Holman*, 23 Wash. 347; 3 Washburn on Real Property (4th ed.) 187, 191, and authorities cited.

    As between those claiming a right of the same character—that is, a public right of fishery and a private right of fishery—this doctrine of the common law, being of a general nature, is just as applicable in Colorado as elsewhere. Necessity does not furnish a basis for the right of public fishery upon which, it is said in *Yunker v. Nichols*, 1 Colo. 551, rests the dominant right of one land owner in this state to build a conduit over the lands of another, in order to get water from the stream to irrigate agricultural lands. Of course, as between those claiming either a public or private right of fishery in our natural streams, and those asserting the superior constitutional right of appropriation, the latter, in case of conflict, must prevail. But the rights here in controversy are both of the same character and subject to the common law rule of decision. Gen. Stats. 1883, sec. 197. Plaintiff owns lands bordering on both banks of natural streams. As between him and the defendant, he owns the right of fishery in their waters within his outer boundaries. As between them, plaintiff also owns the beds of the streams

just as much as he owns the adjacent banks or the soil anywhere within his surface lines. It necessarily follows that defendant has no right of fishery within plaintiff's enclosure.

But if he does, he certainly has no easment over any portion of plaintiff's property, either in the beds of the streams or the adjacent soil, for the purpose of reaching the streams. In the enjoyment of his private property plaintiff is protected, both by federal law and the state constitution, against encroachment by defendant. Neither the state nor an individual nor a corporation to whom the right of eminent domain is delegated, can take private property for public use without just compensation; much less can the state, without any compensation at all, take the private property of one, and give it to another citizen to be enjoyed by the latter for a mere private use. The legislature cannot make lawful a trespass by one man upon the lands of another, by providing that, if any damage is thereby done, a recovery therefor may be had. That is just what our general assembly by its statute has attempted. But the act contravenes the provisions of section 15 of article 2 of our state constitution, and is clearly in conflict with the laws of congress relating to the disposition of the public domain.

The judgment of the district court is reversed and the cause remanded with instructions to the district court to enter a judgment favorable to plaintiff. *Reversed.*

Mr. Justice Gunter, concurring specially:

I think the judgment below should be reversed, and to this extent concur in the majority opinion. I do not, however, think it necessary in reaching this conclusion to go into the important question of

riparian rights, upon which the court divides. It is said by our attorney general, who appears as an *amicus curiae,* also by other *amici curiae,* all of whom are of counsel in the case now pending between this commonwealth and the state of Kansas in our national supreme court, that the questions considered in the majority and minority opinions are to some extent involved in that case. It would seem to be wise to avoid discussing unnecessarily here any question that may be ruled there.

The facts involved herein are simple: Plaintiff was the owner in fee of certain lands, which were enclosed, and through which ran a section of Tumiche creek; defendant, standing in the bed of this section of the stream, frequently fished therein, and when requested to desist refused to do so, and asserted his right to continue the alleged trespass. I think, as stated by one of *amici curiae,* the simple question here is: Has a fisherman the right to fish where the game law says he shall not?

The question involved arises under the game laws of 1899, chapter 98, the amendments of 1903, not affecting them when the proviso of that year, found in subdivision 7, § 7, Laws 1903, p. 233, discussed in the main opinion and held therein to be unconstitutional, is eliminated. Section 16, division a, Laws 1899, chapter 98, reads as follows:

"All game and fish now or hereafter within this state not held by private ownership, legally acquired, and which for the purposes of this act shall include all quadrupeds, birds and fish mentioned in this act, are hereby declared to be the property of the state, and no right, title, interest or property therein can be acquired or transferred, or possession thereof had or maintained, except as herein expressly provided."

Illinois has a similar statute, and in *Meul v. The People,* 198 Illinois 258, it is said:

"Prior to this enactment the state had general ownership of animals *ferae naturae*—not as a proprietor, but in its sovereign capacity, as the representative of the people, and for the benefit of all the people in common. Sec. 11 places the title and ownership in the state as a proprietor, and the individual may no longer acquire ownership by capturing, killing or reclaiming such animals, except insofar as permitted so to do by other provisions of the act."

In *Geer v. Conn.*, 161 U. S. 519, perhaps the leading game case in this country, it is said:

"From the earliest traditions the right to reduce animals *ferae naturae* to possession, has been subject to the control of the law making power. * *. * In most of the states laws have been passed for the protection and preservation of game. We have been referred to no case where the power to so legislate has been so questioned, although the books contain cases involving controversies as to the meaning of some of the statutes * * *"

In *Magner v. The People*, 97 Ill. 320, the court said:

"The ownership being in the people of the state, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the state, may withhold or grant to individuals the right to hunt and kill game, or qualify or restrict, as, in the opinions of its members, will best subserve the public welfare."

These authorities are approved in *Hornbeke v. White* (Colo. App.) 76 Pac. 926. The statutes of Colorado read in the light of these decisions vest the ownership of game in the state as a proprietor, and take away the "right to capture and kill unless prohibited" as it existed at common law, leaving under these statutes no right to capture and kill, ex-

cept as permitted. In the language of counsel, "In other words the game without such statute was like the water of the streams, ordinarily open to the first appropriator, except as prohibited by law, while under these statutes, like the land and timber of the state, it can be pursued, appropriated to use or held in possession only as permitted by law."

Section 2, division b, Laws 1899, p. 191, so far as pertinent is:

"No person shall shoot from a public highway at game, or fish, or hunt game in any enclosure not public land, without the consent of the owner or persons in charge of the same."

This section, prohibiting fishing within the enclosure of another without his consent, was in force at the time of the alleged trespasses of defendant, unless repealed by said sub-division 7 of section 7, Laws 1903, p. 233. This latter section reads:

"That the public shall have the right to fish in any stream in this state stocked at public expense, subject to actions in trespass for any damages done property along the bank of any such streams."

If this section be unconstitutional, as the main opinion holds it to be, and as I think it to be, then said section 2 of division b of the Game Law of 1899, is in existence. Said sub-division 7 of section 7, Laws 1903, purports to give the public a right of way over the land of another "subject to actions in trespass for any damege done property along the bank of any such stream." The right of way so attempted to be given is not confined to the bed of the stream. It purports to give the public such ways over the lands of an owner as may be convenient or necessary to exercising the right of fishery. This section attempts to make lawful a trespass upon the lands of another by providing that if any damage is done a recovery therefor may be had. It was an attempt to

take private property for private use without just compensation. I think it clearly violates section 13 of article 2 of our constitution in prohibiting the taking of private property for public or privte use without just compensation.—*New England Club v. Mather,* (Vermont) 35 Atlantic 323; *Rockefeller v. Lamora,* 83 New York Supplement 289.

We conclude, therefore, that said section 2 of division b, Laws 1899, was in force prohibiting fishing within any enclosure without the consent of the owner.

To sum up, it was competent for the legislature to say that defendant should not fish within the enclosure of plaintiff without his consent. The legislature has so said. Defendant was fishing within the enclosure of plaintiff without his consent, therefore, was there in violation of the law. The defendant was unlawfully on the premises of the plaintiff, and as the lower court held otherwise its judgment should be reversed. ———

Mr. JUSTICE BAILEY, dissenting:

After the former opinion of the court was announced, the attorney general, on behalf of the state, was permitted to intervene, and, upon re-argument, I am convinced that the opinion announced by the majority of the court is erroneous for the following reasons:

The Angles and Saxons, who, in company with the Jutes, invaded and conquered England in the latter part of the fifth and earlier portion of the sixth centuries, were an energetic, freedom-loving people, excessively fond of out-door sports, hunting and fishing. These characteristics were accentuated and emphasized by the Norsemen occasionally making war upon the Anglo-Saxons, and in their raids leaving a portion of their people, who remained and mingled with the Britons.

Until the advent of the Normans, such a thing as regulations concerning the right of fishery was unknown. The waters of the streams, and the fish within the waters were common property. They were as free as the air was free and as the birds which flew in the air were free.

The Normans were a different class of people. They strived for individual power and dominion. The great barons demanded, and William and his successors conceded to them, great landed estates. Then it was for the first time, that the right of fishery was vested in individuals instead of the common people. The king, however, reserved the sea, the arms thereof and the rivers entering therein, so far as the tide ebbed and flowed, because it was necessary to have access to the bays and rivers for navigation purposes. These were called public waters, and the right of the public to fish therein was conceded because they were public waters.

There then grew up a series of distinctions of the right of fishery. These were divided into the "several right of fishery," the "free right of fishery" and the "public" or "common right of fishery." The public right of fishery was the common right to take fish from the waters over which the king held dominion.

There arose in England much litigation over these rights and their alleged violation.

It is unnecessary in this opinion to follow the erudition of the judges and lawyers concerning those matters, except to say, that among other principles which were established, it was held that in a free fishery a man had a property in the fish before they were caught; in a common of piscary or public fishery and in a several fishery, not until afterwards; that a public river is a public highway, and this is its distin-

guishing characteristic; that the right to common of fishery was vested in the people in all public rivers.

These are the principles which are deduced from the learning of the English courts and jurists as they existed at common law.—2 Blackstone 39; Coke on Littleton 122; Hargraves Note 181; Lord Hale De Jure Maris 11.

At that time what were called public rivers were only the rivers affected, and to the extent that they were affected, by the tides, because that was the extent to which they were used for navigation.

In the United States the right of public fishery was acquiesced in for many years. At any rate, the books are silent as to any question concerning it being raised for many years; until the landed proprietors, in imitation of their Norman ancestors, began to exclude the public from the streams running through private lands. It was then determined, in this country, that the right of fishery existed in all public rivers, and streams and rivers were public which were navigable under the then existing conditions. It was no longer limited to that portion of the stream which was affected by the tide, but, so far as a boat could travel, the right of fishery existed. This right of public fishery was based upon the fact that the stream was a public stream and that the public had the right of way. It has never been held that in these public streams the landed proprietors had any property in the fish before they were caught.

The doctrine was next extended to all streams upon which logs or ties or the like could be floated, even though it was necessary by use of physical strength to force the logs or ties over the shallows and riffles; and the doctrine was still announced that the right of fishery existed because the people had the right of way along the stream, and that the right of fishery went with the right of way.

The case of *Schulte v. Warren*, 75 N. E. 783, decided by the supreme court of Illinois in October last, is strenuously argued as being of great force in this contention.

Rightly viewed, the *Schulte case* should have but little influence in this matter for at least two reasons.

First: The matter before the court and the principles involved in a determination of that matter were entirely different from that which is here involved, and the principles necessary for a determination of the same. In the *Schulte case* it, appeared that the plaintiff owned a large tract of land situate in the Illinois river bottom. It was bounded on the west side by the river. This land was swamp and overflow land, and was subject to overflow in times of high water from natural causes. Previous to the construction of a certain lock and dam, and the opening of a certain canal, the lands were valuable for pasturage during the late summer and early fall, when the high waters had subsided. Part of the land had been under cultivation. By the construction of this dam and lock and the canal the water in the river was so raised as to overflow the lands and render them worthless for agricultural purposes. These swamps and overflowed lands became the resort of large flocks of wild fowl. This gave the lands a market value for hunting purposes.

It also appeared that the plaintiff, in order to render these lands more attractive, had seeded certain portions to grasses and other vegetation seductive to the wild fowl.

The defendants, who were insolvent (there is no allegation of insolvency here), had repeatedly trespassed upon the *lands* and hunted over the same, and threatened to continue to hunt thereon. An injunction was prayed for. Defendants contended that because of the construction of the dam, lock and

canal, the waters had, been raised and covered the lands to a depth sufficient for navigation, and that therefore the public acquired the right of hunting and fishing in said navigable waters.

It will be observed that these lands were private lands, and the waters outside of the bed of the stream were not navigable in their natural condition, but that the lands were available for agricultural purposes. The public, either rightfully or wrongfully, caused the river to overflow its banks permanently, so that which had theretofore been agricultural land became covered with water to such a depth that it was possible to navigate it. This made of it artificial water, and it was apparent that the only question properly before the court was as to whether the taking of the lands for one purpose, to wit, the maintenance of the dam, lock and canal, made of the waters standing thereon public waters for all purposes.

With us, as we shall presently see, waters of the natural streams of this state are made public waters for all purposes, subject only, however, to the condition that the right of appropriation is a privileged right. Consequently, the principles involved in the determination of the *Schulte case* are entirely foreign to the principles involved in the determination of this case.

Second: The doctrine as announced in the *Schulte case* is not in harmony with the great weight of authority in the United States, while, as above stated, the sole question which was properly before the Illinois court was as to whether the taking of the lands of plaintiff by the state for one purpose gave the citizens of the state the right to use them for other purposes, yet the court, in its opinion, goes learnedly into the entire question of the right of hunting and fishing in navigable waters, and determines, *obiter dicta,* that waters which are capable of

floating logs are not navigable; that they must be capable of bearing up and floating vessels for the transportation of property; and the fact that there is water enough for row boats or launches does not render the waters navigable.

It is further determined that the right to hunt and fish in waters is not incident to a right of navigation in such waters. The owner of the land has the exclusive right to hunt and fish on his own land, irrespective as to whether the waters are navigable or not.

In rendering this *obiter dictum* opinion, the court simply announced what has long been the rule in Illinois. *Beckman v. Kneamer*, 43 Ill. 447. But it is entirely at variance with the great weight of authority.

In *Willow River Club v. Wade*, 100 Wis. 36, and *Lincoln v. Davis*, 54 Mich. 375, it is held that the public use of a stream for floating timbers or for small boats is on the same principle as the use of highways by land for similar purposes; that one in passing along a stream may stop and fish, or he may go into or upon the stream for the express purpose of fishing.

This doctrine is also announced in *People v. Horling*, 100 N. W. 691; *Lamprey v. State*, 52 Minn. 181, and *New England Trout Club v. Mathews*, 68 Vt.

Similar rules were announced in Pennsylvania, South Carolina, North Carolina and Louisiana.

In Gould on Waters, 166, it is said that the purpose of navigation is immaterial, and those who pass upon the water for the purpose of pleasure, fishing and fowling have equal rights with those who navigate for business, trade or agriculture.

"If fishery at a particular place is of such importance to the public that the public shall have the right to exercise it, it is within the true line or devel-

opment of the law to hold that such use was within the original purpose of the highway, so that the public right would extend to it."—Farnham on Waters and Water-Rights, 171.

Again, it is well settled in this country, as well as in England, that where the title to the bed of a river is in one owner and the title to the water is in another, the right of fishery follows the title to the water.—Washburn on Eas. & Serv., 566; *Jackson v. Halstead,* 5 Cowen 216; *Halford v. Bailey,* 8 Q. B. 1000; *Malcombson v. O'Dea,* 10 H. L. Cases 593; *Lee v. Mallord,* 116 Ga. 18.

While we have not gone to great length in reviewing the many cases bearing upon the right of fishery, a careful study of them will demonstrate two things: That where the land belongs to one party and the water to another, the right of fishery follows the ownership of the water, and where the public has an easement in the water for the purpose of navigation, fishing goes with the easement as an incident thereto, for the reason that the waters are public.

Now, let us endeavor to determine whether or not the natural streams of this state are public or private property.

Public property may be defined as that which is dedicated to the public use, and over which the state exercises control and dominion.

With this definition in mind, we will examine the constitution and various acts of the legislature with some care.

The constitution of this state provides:

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."—Sec. 5, art. 16.

This makes the waters of every natural stream public. They are dedicated to the use of the people, to be used by them in such manner as they see fit, subject only to one condition; that of the right of appropriation for beneficial purposes. Until the waters are appropriated and diverted from the stream, they belong to the public.

No stronger words could have been used by the people than are used in this declaration. It is idle to say that the waters of the streams are dedicated to the public for the purpose of appropriation, because those are not the words of the constitution. It is a grant made subject to that right.

The moment that water is appropriated, it ceases to belong to the public, but becomes the property of the appropriator. The individual who makes the diversion, and the appropriation, has the exclusive right to its use, and the public is barred from interfering with it.

The contention that the water of a stream is dedicated to the people for the purpose of appropriating it must fall of its own weight, because, immediately upon its being appropriated, it no longer belongs to the people. The appropriated water belongs to the appropriator. If the dedication to the people was for the sole purpose of appropriation, there is no dedication. The dedication does not go into effect until the appropriation is made, and the moment it is made the water ceases to belong to the people, but becomes the property of the appropriator. So, the right does not exist until the appropriation is made, and it ceases to exist the moment the appropriation is made. It has therefore no existence at all.

Inasmuch as the right of public fishery has always existed in streams known as public streams, the right of fishery exists in the natural streams of

Colorado, because, the water being dedicated to the public, makes the streams in which that water flows, public streams.

It is scarcely correct to say that the right of fishery existed in navigable streams, simply because they were navigable. The act of fishing is not necessarily connected with the act of navigation. Their being navigable made them public, and their being public gave the right of fishery. So that, it ought not to be said that fishing is limited to navigable streams.

Navigation is only one of the ways by which a stream may be made public. There is no higher authority for making a stream public than the declaration of the people themselves, in their compact of organization dedicating it to the use of the people.

The grant made by the constitution is the fundamental law of the land. It is one of the sacred rights of the people and the courts being, to a large extent, the guardians of these rights, should see to it that they are not annulled, violated or abridged.

When, by the constitution, the water of the natural streams of the state was declared to be the property of the public, and was dedicated to the use of the people, there was also dedicated to their use a right of way through the channel of every natural stream of the state, because such right of way is a necessary incident to the full and complete use and enjoyment of the grant, and no private ownership can defeat such right of way.

The legislation of this state has always assumed, not only public ownership of the water, but also the right to direct and control the use of the channel or bed of the stream.

In 1872, before Colorado became a state, the legislature passed an act which provided:

"That it shall and may be lawful for any person or persons to float any and all kinds of timber, such as saw-logs, ties, fencing poles or posts and fire-wood down any of the streams of this state."

If, as has been frequently determined by courts of last resort, the floating of logs or ties is an act of navigation, then the floating of poles or posts or fire-wood is navigation, and here, by a legislative grant, the right of way was given to the public down and through these streams and they were made public streams.

Then came the adoption of the constitution, which reiterated the doctrine that these were public streams.

Again, in 1879 the legislature passed an act providing that the owners of reservoirs may conduct the water from the reservoirs into and along any of the natural streams of the state, thus emphasizing the doctrine that these were public streams.

In 1881 the legislature recognized the right to construct dams in the public streams of the state, but made the condition that in the construction of such dams, fishways should be made, providing for the passage of the fish. This was reiterated in 1897 and again in 1899, and in the act of 1899 it is pro-vided that no ties or timber shall be driven or floated down any streams containing fish. Upon this last provision great stress is laid by some of the friends of the court; because it is said that it directly repeals the law of 1872, making provision for the floating of logs and other timber down the public streams.

The conclusion to be drawn from the act of 1899 is favorable to the defendant, rather than otherwise, because, while it prohibits the floating of timber on the streams containing fish, it reiterates and em-phasizes the fact that the state assumes absolute con-trol over these streams, it having in effect thereto-

fore declared that they were public highways. It now declares that such use shall not be made of the public highway as to be injurious or detrimental to the fishing interests.

In 1897 the legislature passed an act which permitted any person or company to divert water from one public stream and turn it into another public stream, and take out the same amount of water again, making provision for loss by seepage and evaporation. So here, again, is a solemn declaration that these are public streams.

By the act of 1897 the people were given the right to increase the flow of the stream, the exercise of which right might easily injure adjoining property. In this case it is contended that the right to wade in the stream, which could not possibly injure the property, could not be given.

Then came the act which is in question here, approved in 1903. This provides that the public shall have the right to fish in any streams in this state, stocked at public expense, which is but a reiteration of the doctrine as first announced in 1872, that these streams are public. For more than thirty years they have been treated by the people, and by the representatives of the people at each general assembly, as public streams. It is asserted that this act is in violation of section fifteen, article two of the constitution, in that it is an attempt to take property without due process of law. I fail to see the force of this assertion. The same constitution provides that these streams are public, the waters are dedicated to the use of the people, and, as we have seen, if the streams themselves are public, and the water belongs to the people, the people have the right of way in the bed of the stream for all purposes not inconsistent with the constitutional grant, and he who comes into the state and settles here and takes

land, must take it according to the local usages and customs, and under the provisions of the laws of the state.—*Fall v. Cook,* 19 Ore. 455.

Riparian rights in the several states are dependent upon the state laws.—*Lamprey v. State,* 52 Minn. 181; *Kenyon v. Knipe,* 46 Fed. 309.

In the opinion of the majority of the court it is stated that this land was filed upon and taken subsequent to the adoption of the constitution, and therefore it was taken subject to the constitutional provisions, and, if that is true, the right of way in the bed of the stream never did belong to the proprietor of the estate, except subject to the right of the public, and, inasmuch as it never belonged to the plaintiff, it could not be taken from him.

The people have at all times since the adoption of the constitution acted along the belief that the right of public fishery existed in all of the streams of the state. They have established hatcheries for the propagation of fish wherewith the streams might be stocked, so that the supply would not be exhausted. They have established a department of the government of the state for the purpose of guarding, controlling and protecting the fish in these public streams. In the establishment of the fish hatcheries they expended, since the year 1881, fifty-two thousand nine hundred dollars. In the payment of expenses for the fish and game department, for salaries and the maintenance and protection of these fish, they have expended since the adoption of the constitution, two hundred and fifty-eight thousand six hundred dollars, making the princely sum of $311,500.00 which the people have paid, that they and their children and their guests might enjoy the privilege of a few months' recreation in the summer season, by fishing and the like.

Can it be said that the construction placed upon the constitution by the representatives of the people, practically contemporaneous therewith and continuously down to the present time, shall have no influence with the court?

Can it be said that the constant and repeated declarations of the legislature since the territorial days, to the effect that these waters and these streams are public waters and public streams, and the filling of them with fish propagated and cultivated at great expense, should have no weight in determining the matters here involved? Can it be said that the representatives of the people have done these things for the advantage and profit of the landed proprietors, and not for the benefit of the people themselves?

It is fully recognized that the paramount right to the use of the waters of this state shall be for irrigation, mechanical and domestic purposes, yet, this right must be exercised as far as possible so as not to interfere with the right of fishing. If the contention of the plaintiff and some of the friends of the court is correct, how vain have been the acts of the people and of their representatives in legislature assembled. For more than thirty years they have made the most elaborate provision for the cultivation and preservation of the fish in the natural streams of this state, yet, it is said that the people at whose expense this has all been done shall neither have profit nor pleasure therefrom, but it all inures to the benefit of the adjacent proprietor.

One of the friends of the court, in his elaborate brief, goes outside of the record to state that many portions of the public streams are not owned by private individuals, but still remain a part of the public domain. The learned counsel says that this may be outside of the record, but that it may fairly be considered as a matter of public knowledge. We

are willing to take it upon that ground, but it may be fairly stated as a matter of fact that counsel is mistaken. For example, take the principal fishing streams of this state, for instance, the Laramie, the Cache la Poudre, the Big Thompson, the Platte, the Gunnison and the Grand rivers. There is scarcely a foot of any of these streams that is not owned or claimed by settlers, except those portions which flow through rugged and inaccessible gorges and canons, where fishing is impracticable. However, this is but begging the question.

If one man may acquire the land through which a few miles of a stream flows and thereby prevent fishing, he or any number of men may acquire all of the land through which the stream flows, and thus absolutely destroy the right of public fishery.

This action is unconscionable and should not be tolerated, even though it might be maintained upon technical grounds, because there is no allegation, claim or pretense that the defendant was in any way injuring the property of the plaintiff. There is no contention that the property of the plaintiff was not in as good condition after the defendant had ceased his fishing operations, as it was before. He was not walking upon the banks of the stream; he was not treading down the grass of the plaintiff; he was not breaking the twigs of the trees that grew along the banks. In no way was he interfering with the right of possession, nor was he injuring the freehold. He was simply walking upon the ground which was covered with water, and which ground was of no benefit or use to the plaintiff, except for the purpose of supporting his other ground.

It is not contended that the disturbance of the gravel or boulders which lie in the bottom of the stream, and which might be trampled upon by the defendant, would be of any injury to the plaintiff. All

that is complained of is that he stepped his foot upon the plaintiff's barren soil, or boulders and gravel, and this is made the basis of an action.

The doctrine of *de minimus non curat lex* ought to apply with striking force in a case so barren of right, equity or justice as this. If not, it may be well inquired as to when, and under what circumstances, the court will cease to take cognizance of trifles.

If it is determined that the right of public fishery does not exist in this state, the court, by a judicial act, will have confiscated nearly one-half million dollars of the people's money and diverted it to the use and benefit of a few landed proprietors, country clubs and fishing associations. That which belongs to the whole people will be given to a few, and, in that event, the only consistent thing for the legislature to do will be to pass an act authorizing the dismantling of these fish hatcheries and abolishing the offices of the fish warden and his deputies, and refuse to make further appropriations for the purpose of maintaining establishments which are to be used solely to afford the means of enjoyment to those who are enabled, by reason of their wealth or other fortunate condition, to acquire by purchase, lease or otherwise, the right of fishery from the ranchmen who live upon these streams. That which has heretofore been free, will become an object of barter and sale. The poor, to whom work is a necessity and recreation a blessing, will be deprived of a constitutional right, so that the pleasure of the clubmen and the landholders may be increased.

It having been declared by the people in their constitution that the waters of the state belong to the people, and everything necessary to the complete enjoyment of those waters perforce going with the constitutional grant, and the people having exercised the right of way through these streams for every con-

ceivable purpose since the territorial days, and the streams having been stocked with fish belonging to the people, and the representatives of the people, in legislature assembled, having frequently declared, in effect, the existence of this right of way, and prohibiting by legislative enactment the right of the freeholder to interfere with the flow of the water; I, for one, am not willing to consent that this property and these rights may be taken by judicial repeal from the people, in whom they are vested by constitutional grant, and given to the individual proprietors and the club lessees by judicial enactment.

Since the foregoing was prepared, Mr. Justice Gunter has written his concurring opinion, in which he agrees with the conclusion arrived at by the majority of the court, but arrives at the same conclusion by a different mode of reasoning, which, in my opinion, is also untenable.

The question in this case is not: "Has a fisherman the right to fish where the game law says he shall not?" But it is: May a fisherman fish where the game law says he may?

Suppose this proviso of the act of 1903 is unconstitutional, it does not necessarily follow that the contention of the learned justice is correct, for, as I have shown, in the absence of a statute in this state, the fisherman would have the right to fish in the waters flowing over the land of another, provided this could be accomplished without damaging the property of the proprietor, and it is a grave question as to whether the act of 1899 is not repealed by the repealing clause of the act of 1903. It is unnecessary to investigate that matter, because, in order to declare this act unconstitutional, it is necessary to read into it words which are not there.

The words of the statute are that the "public shall have the right to fish in any stream in this state,

stocked at public expense, subject to actions for trespass for any damage done the property along the bank of any such stream."

I am unable by any process of reasoning to read into this statute a permission to damage the property along the bank of the stream or elsewhere. The right that is given is only of fishing, and if that right can be exercised without damaging the adjoining property, then no property has been taken or damaged in violation of the statute.

To say that this act violates the constitution because it permits the public to take or damage private property, is to say that the act authorized the taking or injuring of the property, and, with all due deference to the learned jurists who have written the foregoing opinions, I must say that it is impossible for me to find anything in the words of the statute which warrant such a construction. The statute gives the right to fish in the stream and that is all that it gives. If the right may be exercised without damaging or injuring the property of another, then it does not violate the provisions of the constitution. The statute should be so construed as to permit these things which the law says may be done, if by so doing the constitutional rights of others are not impaired.

That fishing may be engaged in without damaging the property of the adjoining proprietor, is apparent from this case. Here, the defendant was standing in the stream without damaging, injuring or molesting the property of another, and this the law says that he may do, and the constitution does not prohibit it.

The provision of the statute which gives the right to maintain an action to recover for damage done to the property under the banks cannot be construed as authorizing the commission of a trespass. The fair construction to be placed upon those words

is simply that the statute shall not be so construed as to permit the commission of damage.

It is a fundamental doctrine that where a statute is capable of two constructions, that must be adopted which will render the statute constitutional, and this is true even though it be not the most obvious construction.—Sedgwick on Construction of Statutes and Constitutional Law, 266 and note A.; *Iowa Homestead Company v. Webster County,* 21 Ia. 221; *Goldwell v. The May Landing Water Power Co.,* 19 N. J. Equity 245; *Bigelow v. West Wis. Ry. Co.,* 37 Wis. 478.

"When courts are called upon to pronounce the invalidity of an act of legislature, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution and examine it in every possible aspect, and ponder upon it as long as deliberate and patient attention can throw any new light upon the subject, and never declare the statute void unless the nullity and invalidity of the act are placed in their judgment beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action and the act be sustained."—Cooley on Constitutional Limitations, 252

And again, the same author at page 255 says:

"The duty of the court to uphold a statute when conflict between it and the constitution is not clear, and the implication which must always exist that no violation has been intended by the legislature, may require it in some cases, where the meaning of the constitution is not in doubt, to lean in favor of such a construction of the statute as might not at first view seem most obvious and natural. For, as a conflict between the statute and the constitution is not to be implied, it would seem to follow *that the court, if*

*possible, must give the statute such a construction as will enable it to have effect."*

There is no necessity to further multiply words or add authorities upon propositions which appear to be fundamental. In order to declare this statute unconstitutional, the court must say that the legislature intended to give the right to take or damage private property and avoid the law, not because of what the legislature did, but because of what the court thinks it intended to do, and must add to the law words which are not there and which by fair construction cannot be presumed to be there. The courts have sometimes given a forced construction to a law in order to maintain it, but that this should be done in order to destroy it is contrary to the authorities. It is rather anomalous to assume that the legislature intended to say what it did not, and then declare what it did unconstitutional because of such assumed intention.

As to whether or not a fisherman would have the right to walk along the banks of the stream and tread down the grass of the proprietor by virtue of the terms of this statute, is a question not before the court. The question here determined is as to whether or not the legislature can give the right to fish in streams flowing over the land of another, when that right is exercised without damage, injury or detriment to the estate of the adjoining proprietor.

I am firmly convinced that the construction placed upon this statute, in order that the same may be declared unconstitutional, is a violent one and unwarranted by the terms of the act.

My excuse, if any be needed, for the filing of this dissenting opinion is the grave danger to the agricultural interests of the state by the announcement of the doctrine that the state has not full and absolute control of the unappropriated waters of the

state, and the fear I have that such a ruling will plunge the people into interminable litigation.

Mr. JUSTICE STEELE concurs.