[No. 3494.   Decided December 3, 1900.]

THOMAS S. GRIFFITH *et ux., Respondents, v. F. J. HOLMAN, Appellant.*

PUBLIC NUISANCE—ABATEMENT.

A public nuisance can be abated only by a public officer, except where the party who desires to abate it has some special interest in the abatement which is different from and greater than the interest of the community.

NON-NAVIGABLE STREAMS.

An unmeandered fresh-water river averaging in width about forty feet, and in depth about four feet during high water and two feet during low water, in some places during the low stage being as shallow as six inches, and which has never been navigated except by row boats of ordinary size, run up and down the river by persons fishing for pleasure, is a non-navigable stream.

SAME—RIGHTS OF RIPARIAN PROPRIETOR—RIGHT OF FISHERY.

The riparian proprietor upon the banks of a non-navigable, fresh-water stream, owns the exclusive right of fishery in the waters flowing opposite his land, as far as the middle of the stream.

SAME—RIGHT TO FENCE.

One who owns both banks along a non-navigable stream has title also to the land in the bed of the stream, and may lawfully place a fence across a stream thus flowing through and over his land.

Appeal from Superior Court, Spokane County.—Hon. WILLIAM E. RICHARDSON, Judge.   Affirmed.

*R. L. Edmiston,* for appellant.

*A. E. Gallagher,* for respondents.

The opinion of the court was delivered by

. DUNBAR, C. J.—This action is brought by the respondents to recover of appellant $250 as damages which re-

spondents sustained by reason of the appellant cutting a wire fence on the land of respondents in Spokane county, where such wire crossed the stream known as the "Little Spokane River," which flows through the land of respondents; and also to recover of the appellant the sum of $250, the value of certain trout fish which appellant caught in said Little Spokane river while in a boat on said river on respondents' land where said river runs across the land of respondents, and which said fish appellant took and converted to his own use. A demurrer interposed to the amended complaint was overruled. Defendant (appellant) refusing to plead further, the court, made findings of fact and conclusions of law in accordance with the allegations of the amended complaint, and gave judgment in favor of plaintiffs (respondents) and against defendant for $500 and costs. The findings of fact following substantially the allegations of the complaint, it is necessary to examine only the allegations of the complaint, under the first assignment of error, that the court erred in overruling the demurrer of defendant to the amended complaint, although assignments of error are based upon the conclusions of law.

It is conceded by the appellant that only two propositions are involved, viz: (1) Did the respondents have a legal right to place on their land the barbed wire fence in question across the stream, so as to prevent the passage of row boats; and (2) Did the appellant have a right to catch fish in the stream on respondents' land, he being in a row boat, as alleged in the amended complaint. The complaint alleges in the usual manner the trespass and the catching of the fish, the ownership of the land and that said stream had never been meandered, and gives the following description of the stream:

"That said Little Spokane river, where the same runs through, over, and across the premises described, and for ten miles up said river from said premises, and down said river from said premises to the mouth of said Little Spokane river, during high. water in said river, the water therein is of an average width of forty feet and on an average during said time of four feet in depth; that high water continues at various stages in height in said river for about three months during each year, and the water in said river at said premises and up and down said river from said premises for the distance above stated during the rest of each year for the last twenty years has been about forty feet in width and two feet in depth; that the depth and width of the water in said river for the distance above mentioned varies at different places in said river at all seasons of the year, the water in said river at places becoming wider than as above stated, and at places as low as six inches in depth; that said river from a point about ten miles above the premises above described to its mouth, carries at all seasons of the year sufficient water in width and depth so as to permit the running of row boats of the usual size up and down said river; that no part of said river has ever been used as a navigable stream or highway for any purpose whatever, except that said river has been used to a limited extent for the purpose of pleasure by the running of row boats up and down said river by persons desiring to fish for pleasure in said river."

It alleges the maintenance by the plaintiffs of the barbed wire fence above mentioned, the catching of the fish by the defendant without any authority, and the appropriation of the same to defendant's use.

It is contended by the appellant that the stream was a navigable stream and that, therefore, the defendant had a right to navigate the stream and to fish therein; and that the respondents had no right to put a fence of any kind across it which would interfere with the right of the pub-

lic to use it for all purposes for which nature made it applicable;—citing in support of this contention §7303, Bal. Code, which is a statute to prevent the obstruction of navigable waters in this state; and that, the fence being, a public nuisance, the appellant had a right to abate it. But, even conceding for the purpose of the discussion, that the stream was a navigable one, the principle of law is well established that a public nuisance can be abated only by a public officer, except where the party who desires to abate it has some special interest in the abatement which is different from and greater than the interest of the community. The cases which the appellant cites from this court to sustain his contention are squarely opposed to him. Thus, in *Carl v. West Aberdeen Land , etc., Co.*, 13 Wash. 616 (43 Pac. 890), the right to abate the nuisance was founded upon a special interest; the court in that case saying:

"Under this assignment of error it is further contended that the obstruction was a public one, but, even if it was, the plaintiffs showed that they were so situated that they had a special private interest in having it removed so that they could pass their logs down the river, and for that reason were entitled to maintain their action for that purpose."

Even this case was where there was an action to abate the nuisance, and not an attempt by the party to abate it himself.

The citation from Gould on Waters, § 42, does not seem to us to affect the question in any way. That special damages must be shown, see *Jones v. St. Paul, etc., Ry. Co.*, 16 Wash. 25 (47 Pac. 226); *Stufflebeam v. Montgomery*, 2 Idaho, 763 (26 Pac. 125); *Esson v. Wattier*, 25 Ore. 7 (34 Pac. 756); 2 Wood, Nuisances (3d ed.), § 646, and cases cited in note 4.

But we are of the opinion from the allegations of the complaint that the river was non-navigable. Hence it becomes necessary to ascertain the rights of riparian owners. The title to the land under all the navigable waters of this state passed from the sovereignty of the United States to the sovereignty of the state upon the admission of the state to the Union; but, under the well established law of the land, the title to the land under the non-navigable waters passes from the United States to the grantee of the upland bounding on such non-navigable waters as an incident to such grant; and, although at the common law the test of the navigability is the ebb and flow of the tide, yet, especially in this country, it is held that the rivers and streams above the ebb and flow of the tide, which have sufficient capacity for useful navigation, are public rivers and subject to the same general rights which the public possesses in navigable waters. But we are clearly of the opinion that the stream under consideration is a non-navigable stream. Many of the authorities which we will cite in support of this contention support also the other propositions indicated above, and they will, therefore, be cited indiscriminately.

"A stream is a public highway wherever it is suitable in its natural condition for general use in travel or in the transportation of property." Gould, Waters, §107.

"If the stream is not always navigable it must be capable of floatage, as the result of natural causes, at periods ordinarily recurring from year to year, and continuing for a sufficient length of time in each year to make it useful as a highway. The mere possibility of occasional use during brief or extraordinary freshets does not give it a public character. A similar principle applies in the case of small tidal creeks, in which, although *prima facie* they are public and navigable, private property may be maintained. It is not every small creek in which a fishing skiff or gunning canoe can be made to float at high tide which

is deemed subject to public use; but in order to have a public character, it must be navigable for some purpose useful to business or pleasure." Id. §109.

"But, while the common law only regarded those streams in which the tide ebbed and flowed to the extent of such flow and re-flow as navigable, yet there was another class of streams called fresh-water streams, which, if susceptible of navigation by 'boats and lighters', or, as it would seem, for any beneficial public purpose, and were navigable *in fact*, were regarded as *highways* over which the public had free access, for the purposes of trade and commerce. The only *real* distinction between the two classes of streams arose from the distinction as to the ownership of the *alveus* of the stream, and the rights of riparian owners therein. In all salt-water streams, subject to the action of the tides, the king not only owned the *alveus*, but had exclusive title in, and jurisdiction over the stream for all purposes not inconsistent with navigation, while in fresh-water streams, the riparian owner had certain special privileges of which the king could not deprive him. He had the exclusive right of fishery, the benefit of alluvial deposits or accretion, the right to erect wharves which did not impede navigation and to take tolls for the use of them, and, in fact, a right to make any use of the water or the bed of the stream that his tastes or interests dictated, that did not interfere with the public right of passage. Therefore, when it is said that by the common law no stream is regarded as *navigable* except those in which the tide ebbs and flows, it is not meant that no other streams are burdened with a public easement of passage, but that *in law.* and irrespective of the question of fact, all such streams are navigable,whether they are so in fact or not, and that the title thereto, with all privileges, vests in the king; and that all other streams, *navigable in fact*, are highways for the passage of boats, but the title to which, with all special privileges, outside of the public easement, vests in the owner of the banks." 1 Wood, Nuisances (3d ed.), §452.

So that it would seem in this case that, even conceding that the stream, which is a fresh-water stream, be a navigable or public river, yet the right of fishing remained in the owner of the banks, the public having only an easement over the land, and the taking of the fish therefrom would be a trespass for which the owner would be entitled to damages. It is true, the fact that a stream is not·meandered does not establish the fact that it is a non-navigable stream, but probably indicates that, in the minds of the officers ordering the survey, it was not a navigable stream. It is well established that, except in salt-water streams, the question of navigability is one of fact that must be established by those who seek to use it as such; and it is also well established that the stream must be navigable in its natural state, unaided by artificial means or devices. This proposition was announced by this court in *East Hoquiam Boom, etc., Co. v. Neeson,* 20 Wash. 142 (54 Pac. 1001), where it was said: "It is well settled that a stream which can only be made navigable or floatable by artificial means is not a public highway;" citing many cases to sustain the proposition. In *Rowe v. Granite Bridge Corporation,* 21 Pick. 344, Chief Justice SHAW, delivering the opinion of the court, said:

"Nor is it every small creek, in which a fishing skiff or gunning canoe can be made to float, at high water, which is deemed navigable. But in order to have this character, it must be navigable for some purpose, useful to trade or agriculture."

In *Nutter v. Gallagher,* 19 Ore. 375 (24 Pac. 250), a case which is cited by appellant, it is held that a stream or water course, in order to be navigable, must be of sufficient extent and capacity to enable the community at large to utilize it in the navigation of boats and other water craft thereon, for the transportation of products

23—23 WASH.

and other merchandise, or for the purpose of floating logs
and timber from forests to market. In the case of *The
Montello,* 20 Wall. 430, where the language of Chief Jus-
tice Shaw, *supra,* was repeated and indorsed, it was said
that "The capability of use by the public for purposes of
transportation and commerce affords the true criterion
of the navigability of a river, rather than the extent and
manner of that use." It was held in *Haines v. Hall,* 17
Ore. 165 (20 Pac. 831, 3 L. R. A. 609), that a stream
which has a floatable capacity at certain periods, recurring
with regularity and continuing for a sufficient length of
time to make it useful as a highway for floating logs,
is navigable; but to be navigable in this sense it must be
capable of such floatage as is of practical utility and bene-
fit to the public as a highway for trade and commerce.
It was further said:

"If its location is such, and its length and capacity so
limited, that it will only accommodate a few persons,
it cannot be considered a navigable stream for any pur-
pose. It must be so situated, and have such length and
capacity, as will enable it to accommodate the public gen-
erally as a means of transportation."

To the same effect is *Burroughs v. Whitwam,* 59 Mich.
279 (26 N. W. 491).

The court, in *Wethersfield v. Humphrey,* 20 Conn. 218,
in passing upon the question of whether certain waters
were navigable, after reciting the fact that at times a
fish-boat, or skiff, or Indian canoe might have been pushed
through the waters, said:

"But this is not navigation. That only is such, and
those only are navigable waters, where the public pass and
repass upon them, with vessels or boats, in the prosecu-
tion of useful occupations. There must be some com-
merce or navigation which is essentially valuable;"—

citing Lord Hale's remarks in his treatise *De Jure Maris*:

"There be some streams or rivers that are private, not only in property and ownership, but also in use, as little streams and rivers that are not a common passage for the king's property."

To the same effect is *American River Water Co. v. Amsden,* 6 Cal. 443. In that case it was held:

"A river beyond the ebb and flow of the tide may be navigable, when it has sufficient depth and width to float a vessel used in the transportation of freight or passengers; and this has been extended to its capacity to float rafts of lumber. To go beyond this and declare a stream navigable which can float a log, would be to turn a rule intended for the benefit of the public, into an instrument of serious detriment to individuals, if not of actual private oppression."

"It should be understood that, except in salt-water streams, so far as the tide ebbs and flows, the question of navigability is one of fact, and must be established by those who seek to use it as such; and, also, that the stream must be navigable in its *natural* state, unaided by artificial means or devices. If a stream is not susceptible of *valuable* use to the public as a navigable or floatable stream, without the erection of dams, it is not a navigable stream, even though it might be applied to that use after dams are erected." 1 Wood, Nuisances (3d ed.), §463.

There is no claim here that the stream under discussion was ever used as a floatable stream, or that any transportation has been carried on over it except in small boats, from which persons fished for pleasure.

The legislature of this state has provided that the common law, so far as it is not inconsistent with the laws of the United States, or of the state of Washington, or incompatible with the institutions and condition of society of this state, shall be the rule of decision in all the courts of this state. Bal. Code, §4783. The common-law rule

having been adopted, it must be held that the title to the beds of non-navigable streams is in the adjacent riparian proprietors to the center of the stream. This holding is not inconsistent nor incompatible with the institutions and condition of society in this state, nor with the constitution and laws of the United States or of the state of Washington. It was held by this court in *Benton v. Johncox,* 17 Wash. 277 (49 Pac. 495, 39 L. R. A. 107, 61 Am. St. Rep. 912), that the common-law doctrine declaratory of riparian rights is not inconsistent with the constitution and laws of the United States or of this state, or incompatible with the conditions of society in this state, "unless," said the court, "it can be said that the right of an individual to use and enjoy his own property is incompatible with our condition." The statute law and the decisions of this court, then, having made the common law the arbitrator of the rights of the riparian proprietors, the decisions of the courts declaring the rights of riparian proprietors under the common law become important. In *Hooker v. Cummings,* 20 Johns. 90 (11 Am. Dec. 249), it was said:

"In the case of *The People v. Platt,* * * * we recognized the principles of the common law to be, that, in case of a private river, that is, where it is a fresh water river, in which the tide does not ebb and flow, and is not, therefore, an arm of the sea, he who owns the soil has, *prima facie,* the right of fishing; and if the soil on both sides be owned by an individual, he has the sole and exclusive right."

See, also, *Palmer v. Mulligan,* 3 Caines, 308 (2 Am. Dec. 270).

In *Adams v. Pease,* 2 Conn. 481, it was held that:

"The owners of land adjoining Connecticut river above the flowing and ebbing of the tide, have an exclusive right of fishery, opposite to their land, to the middle

of the river; and the public have an easement in the river, as a highway, for passing and repassing with any kind of watercraft."

"The bed and banks of a fresh water river, where the tide does not ebb and flow, are the property of the riparian proprietors, the public having an easement only for passage as on a public highway; and such proprietors may use the land or water of the river in any way not inconsistent with this easement." (Syllabus.) *Chenango Bridge Co. v. Paige,* 83 N. Y. 178 (38 Am. Rep. 407).

In *Attorney General v. Evart Booming Co.,* 34 Mich. 462, among other things, it was said in substance by Judge COOLEY, who rendered the decision of the court, that the Muskegon river was not a navigable stream, and the public had no rights whatever in the soil under it: that it was only a small stream, whose value to the public consisted in the use that could be made of it for the purpose of floating logs and lumber; and it was held that the property taken in such a case was private property, and the owner of the bank could maintain trespass or ejectment against the taker. See *June v. Purcell,* 36 Ohio St. 396.

In *McFarlin v. Essex Company,* 10 Cush. 304, it was said by Chief Justice SHAW, speaking for the supreme court of Massachusetts, that it was well established as law of the commonwealth that in all waters not navigable in the common-law sense of the term, the right of fishery is in the owner of the soil upon which it is carried on, and in such rivers that the right of the soil is in the owner of the land bounding upon it; citing *Waters v. Lilley,* 4 Pick. 145 (16 Am. Dec. 333)., and *Commonwealth v. Chapin,* 5 Pick. 199 (16 Am. Dec. 386).

In *Lincoln v. Davis,* 53 Mich. 375 (19 N. W. 103, 51 Am. Rep. 116), it was held by the supreme court of Michigan that the law was well settled that riparian

proprietors upon fresh water streams had the exclusive right of fishing in the water opposite their land; citing Gould, Waters, §182, and cases cited in note 1; Angell, Water Courses, §61; *Hart v. Hill,* 1 Whart. 124; *Beckman v. Kreamer,* 43 Ill. 447 (92 Am. Dec. 146). The citation from Gould on Waters, §182, is as follows:

"Riparian proprietors upon the fresh-water streams have the exclusive right of fishing in the water opposite their lands, and this right extends to navigable fresh rivers as well as those which are unnavigable, where the soil of the former is held to be private property. Riparian proprietors upon all such streams, whose title extends *ad filum aquae,* can maintain an action of trespass against those who draw a seine between the center of the stream and the bank of his land."

It is true that the legislature of the state has passed laws regulating fishing, has made close seasons, and provided a penalty for persons killing fish by use of dynamite or other explosives. It is also true that fish are *ferae naturae,* and that their habitat is not entirely local; hence it might be thought that no property in fish could vest in the owner of the land; but it is ownership subject to the rights of the public, and must be exercised with due consideration for the nature of the property, and exercised only when the fish are upon the land of the owner. In accordance with this view, it was held in *State v. Roberts,* 59 N. H. 256 (47 Am. Rep. 199), that, while the right of fishery in waters not navigable was limited to the riparian owner of the soil, and belonged exclusively to him, yet this right in the owner of the land must be regarded as qualified to a certain extent by the universal principle that all property is held subject to those general regulations which are necessary to the common good and general welfare, and to that extent it was subject to legislative control; that it is a well established prin-

ciple that every person shall so use and enjoy his own property, however absolute and unqualified his title, that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the public. Hence, while the riparian owner has the exclusive right of fishery upon his own land, he must so exercise that right as not to injure others in the enjoyment of a right upon their lands upon the stream above and below. But, subject to these qualifications, the right of fishery to the riparian owner is absolute. To the same effect are *Beach v. Morgan,* 67 N. H. 529 (41 Atl. 349, 68 Am. Rep. 692); *Trustees of Brookhaven v. Strong,* 60 N. Y. 56; *Holyoke Company v. Lyman,* 15 Wall. 500; *Sterling v. Jackson,* 69 Mich. 488 (37 N. W. 845, 13 Am. St. Rep. 405); *Washington Ice Co. v. Shortall,* 101 Ill. 46 (40 Am. Rep. 196); *Braxon v. Bressler,* 64 Ill. 488; *Cobb v. Davenport,* 33 N. J. Law, 223 (97 Am. Dec. 718); *New England Trout and Salmon Club v. Mather,* 68 Vt. 338 (35 Atl. 323, 33 L. R. A. 569); *Norcross v. Griffiths,* 65 Wis. 599 (27 N. W. 606, 56 Am. Rep. 642.)

It appearing from the record in the case that the river from which these fish were taken was non-navigable, that the owners had a right to maintain a fence over the same, and that they had the exclusive right of fishery in the waters flowing over the land, and no proper exceptions having been taken to the finding in relation to the amount of damages, the judgment will be affirmed.

ANDERS and FULLERTON, JJ., concur.

REAVIS, J., concurs in the result.