## No. 28235

## The People of the State of Colorado v.
## David B. Emmert, Berlin Taylor, and Elbert Wilson

(597 P.2d 1025)

Decided July 2, 1979.

138

Carroll E. Multz, District Attorney, Gregory F. Long, Assistant, for plaintiff-appellee.

David B. Emmert, for defendants-appellants.

Gerald W. Wischmeyer, for Amicus Curiae Colorado Chapter of the Western River Guides Association, Inc.

Welborn, Dufford, Cook & Brown, William A. McLain, for Amicus Curiae The Colorado Farm Bureau.

Moses, Wittemyer, Harrison & Woodruff, P.C., Raphael J. Moses, Charles N. Woodruff, for Amicus Curiae The Colorado Cattlemen's Association.

Delaney & Balcomb, Kenneth Balcomb, for Amicus Curiae Colorado Water Congress.

Lawrence R. Reno, Stanley W. Cazier, for Amici Curiae The Ritschard Cattle Company and The Lazy 7 Rod & Gun Club.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

The defendants-appellants were convicted of third-degree criminal trespass in violation of section 18-4-504, C.R.S. 1973. The validity of the conviction depends upon our determination of the following question: Did the defendants have a right under section 5 of Article XVI of the Constitution of Colorado to float and fish on a non-navigable natural stream as it flows through, across and within the boundaries of privately owned property without first obtaining the consent of the property owner? We answer this question in the negative and therefore affirm the conviction.

Trial was to the court. The evidence was not in dispute. The facts were stipulated. Some testimony was presented in explanation of the stipulated facts. The record shows that on July 3, 1976, the defendants entered the Colorado River from public land for a float-trip downstream. The Colorado River flows westerly and bisects the ranch of the Ritschard Cattle Company. As it passes through the Ritschard Ranch, it varies in depth from twelve inches to several feet. The rafts on which the defendants floated were designed to draw five to six inches of water, and had leg-holes through which the occupants could extend their legs into the water below the rafts. This enabled the defendants as they floated down the river to touch the bed of the river from time to time to control the rafts, avoid rocks and overhangs, and to stay in the main channel of the river. They touched the riverbed as it crossed the Ritschard ranch. The defendants did not, however, leave their rafts or encroach upon the shoreline or the banks of the river or islands owned by the Ritschard Cattle Company.

The defendants had not asked for nor received permission to float on the river through the Ritschard ranch, and the defendants Taylor and Wilson had previously been warned that they had no permission to float through the ranch.

Upon being notified that a party of floaters was approaching, Con Ritschard and his foreman extended a single strand of barbed wire across the river at the location of the Ritschard private bridge. The strand of barbed wire was from eight to ten inches above the surface of the water and was placed in this position specifically to impede the defendants. Ritschard and his foreman remained on the bridge to tell defendants they

were trespassing on private property. Defendants Taylor and Wilson were stopped at the bridge and told they were trespassing. They denied this and floated their rafts under the barbed wire and remained under the bridge for a period of time until defendant Emmert, and others in the rafting party, caught up with them. Shortly, a deputy sheriff arrived and placed the defendants under arrest, and they were subsequently charged with third-degree criminal trespass.

The parties stipulated that the river is non-navigable and had not historically been used for commercial or trade purposes of any kind. *Accord, Stockman v. Leddy,* 55 Colo. 24, 129 P. 220 (1912). However, the river had been used in the past by recreational floaters using rafts, tubes, kayaks and flat-bottom boats, despite the express objection of the Ritschards. At the time of this incident, the river had been posted with no-trespassing signs.

Also, it was agreed that substantially all of the Ritschard ranch was deeded land with no exclusion of the bed of the river, and that the area where the defendants were stopped was such an area, with the land on both sides of the river owned by the Ritschard ranch.

## I.

The third-degree criminal trespass statute, section 18-4-504, C.R.S. 1973, provides:

"A person commits the crime of third degree criminal trespass if he unlawfully enters or remains in or upon premises. Third degree criminal trespass is a class 1 petty offense."

Defendants do not argue that they did not intentionally float on the river over the Ritschard ranch property without the owner's consent. Their contention is that they did so lawfully as a matter of right under the authority of section 5, Article XVI of the Colorado Constitution. Thus, if the defendants' interpretation is incorrect, it follows that they committed the offense of third-degree criminal trespass.

## II.

It is the general rule of property law recognized in Colorado that the land underlying non-navigable streams is the subject of private ownership and is vested in the proprietors of the adjoining lands. *More v. Johnson,* 193 Colo. 489, 568 P.2d 437 (1977); *Hartman v. Tresise,* 36 Colo. 146, 84 P. 685 (1906); *Hanlon v. Hobson,* 24 Colo. 284, 51 P. 433 (1897). It is clear, therefore, that since the section of the Colorado River here involved is non-navigable the title to the stream bed is owned by the riparian landowner, the Ritschard Cattle Company. Defendants do not dispute the ownership by the Ritschard Cattle Company of the riverbed in question.

The common law rule holds that he who owns the surface of the ground has the exclusive right to everything which is above it (*"cujus est solum, ejus est usque ad coelum"*). This fundamental rule of property

law has been recognized not only judicially but also by our General Assembly when in 1937 it enacted what is now codified as section 41-1-107, C.R.S. 1973:

"The ownership of space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight of aircraft."

Applying this rule, which was implicitly adopted by the court in *Hartman, supra,* the ownership of the bed of a non-navigable stream vests in the owner the exclusive right of control of everything above the stream bed, subject only to constitutional and statutory limitations, restrictions and regulations. Thus, in *Hartman, supra,* ownership of the stream bed was held to include the exclusive right of fishery in the waters flowing over it. It follows that whoever "breaks the close" — intrudes upon the space above the surface of the land — without the permission of the owner, whether it be for fishing or for other recreational purposes, such as floating, as in this case, commits a trespass. *See Restatement (Second) of Torts* § 159.

We have not been cited to any Colorado decisions interpreting constitutional or statutory provisions which may have modified the common law rule of property law upon which we predicate this decision. And we do not feel constrained to follow the trend away from the coupling of bed title with the right of public recreational use of surface waters as urged by defendants. We recognize the various rationales employed by courts to allow public recreational use of water overlying privately owned beds, *i.e.,* (1) practical considerations employed in water rich states such as Florida, Minnesota and Washington; (2) a public easement in recreation as an incident of navigation; (3) the creation of a public trust based on usability, thereby establishing only a limited private usufructary right; and (4) state constitutional basis for state ownership. We consider the common law rule of more force and effect, especially given its long-standing recognition in this state. *Sterling National Bank v. Francis,* 78 Colo. 204, 240 P. 945 (1925). As noted in *Smith v. People,* 120 Colo. 39, 206 P.2d 826 (1949): "If a change in long established judicial precedent is desirable, it is a legislative and not a judicial function to make any needed change." We specifically note that it is within the competence of the General Assembly to modify rules of common law within constitutional parameters.

### III.

The defendants claim that section 5 of Article XVI of the Colorado Constitution establishes the public right to recreational use of all waters in the state. We do not agree with this interpretation. We note that Article XVI is entitled "Mining and Irrigation." Section 5, under the heading "Irrigation," reads:

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."

This provision of the Colorado Constitution, upon which the defendants so heavily rely, simply and firmly establishes the right of appropriation in this state. In this regard, we agree with the decision in *Hartman, supra,* where this court rejected an argument similar to defendants' here, that a person had a right under section 5 of Article XVI to fish in a non-navigable stream bounded by private property without the consent of the owner. In ejecting this contention, the court stated:

". . . The section of the constitution relied upon declares the unappropriated waters of our natural streams to be the property of the public, and dedicates the same to the use of the people of the state, subject to appropriation, as in that instrument provided; and the following section provides that the right to divert the same to beneficial uses shall never be denied. It is this right of appropriation which the general government has recognized and confirmed, and subject to which its grants of public lands in the arid states since 1866 have been made. . . ."

█ The defendants attempt to distinguish *Hartman, supra,* on the grounds that the main thrust of the decision was to hold unconstitutional, as taking of private property without just compensation, that part of Colo. Sess. Laws, 1903, ch. 112, section 7 at 233, which provided: "That the public shall have the right to fish in any stream in this state, stocked at public expense, subject to actions in trespass for any damage done property along the bank of any such stream." The defendants fail to recognize, however, that their misplaced reliance on the constitutional provision was squarely rejected by the language of *Hartman, supra.* We here reaffirm, therefore, that section 5, Article XVI of the Colorado Constitution was primarily intended to preserve the historical appropriation system of water rights upon which the irrigation economy in Colorado was founded, rather than to assure public access to waters for purposes other than appropriation.

Defendants also urge as a better resolution of this controversy that we follow the Wyoming decision in *Day v. Armstrong,* 362 P.2d 137 (Wyo. 1961). We decline to do so. There, under similar facts to those presented in this case, the Wyoming supreme court declared that the public has the right to the recreational use of the surface waters of non-navigable streams bounded by private property.

This conclusion, the Wyoming court declared, was "based solely upon Wyoming's Constitutional declaration that all waters within its boundaries belong to the State . . ."[1] Significantly, unlike Colorado's counterpart con-

---

[1] Article 8 of the Wyoming constitution is entitled "Irrigation and Water Rights." Section 1 thereof, entitled "Water is state property," reads: "The water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state."

stitutional provision, the Wyoming provision does not mention appropriation. As such, it has been regarded as a stronger statement of the public's right to recreational use of all surface waters. *See Sax, Water Law, 354* (1965).[2]

The interest at issue here, a riparian[3] bed owner's exclusive use of water overlying his land, is distinguished from the right of appropriation. Constitutional provisions historically concerned with appropriation, therefore, should not be applied to subvert a riparian bed owner's common law right to the exclusive surface use of waters bounded by his lands. Without permission, the public cannot use such waters for recreation. *Accord, St. Louis Iron Mountain & Southern Railway,* 53 Ark. 314, 13 S.W. 931 (1890); *Herrin v. Sutherland,* 74 Mont. 587, 241 P. 328 (1925); *Monroe v. State,* 111 Utah 1, 175 P.2d 759 (1946); *Griffith v. Holman,* 23 Wash. 347, 63 P. 239 (1900). If the increasing demand for recreational space on the waters of this state is to be accommodated, the legislative process is the proper method to achieve this end.

We find support for our conclusion in various legislative enactments which evidence a posture by the General Assembly that the waters of this state are not unrestrictedly open to the public. Section 33-1-112(g), C.R.S. 1973, gives the wildlife commission the power to:
"Enter into agreements with landowners for public hunting and fishing areas. Such agreements shall be negotiated by the commission or its authorized agent and shall provide that if the landowner opens the land under his control to public hunting and fishing, the commission shall reimburse him in an amount to be determined by the parties to the agreement. Under the agreement the commission shall control public access to the land to prevent undue damage to the land. In no event shall the commission be liable for damages caused by the public other than those specified in the agreement."
Implicit in this section is the legislative recognition of the right of the landowner to close to public access the streams overlying his lands.

------

[2] A possible explanation for the Wyoming supreme court's result is that the allocation and use of water in Wyoming is centrally controlled by the state through an administrative permit system whereby a permit may be denied if determined to be detrimental to the public welfare. This approach contrasts Colorado's minimal state control over appropriation of water. *See Colo. Const.* Art. XVI, Sec. 6, which provides that "the right to divert the unappropriated waters of any natural stream by beneficial uses shall never be denied."

[3] We are not here concerned with littoral bed owner's rights which present another set of practical considerations. As stated in *Snively v. Jaber,* 48 Wash. 2d 815, 296 P.2d 1015 (1956): "What practical value would the vested rights to boat, swim, fish, and bathe, have to any riparian owner if such rights were restricted to his fenced-in pie-shaped portion of the lake?"

Likewise, Article 41 of Title 33 limits the liability of an owner of "land" (which by statutory definition includes watercourses, section 33-41-102(2), C.R.S. 1973) who allows use of his streams by the public. Section 33-41-101 reads:

"The purpose of this article is to encourage owners of land within rural areas to make land and water areas available for recreational purposes by limiting their liability toward persons entering thereon for such purposes."

Again, implicit in this section is the legislative recognition of the right of the landowner to close to public access the streams overlying his lands.

Further legislative support for the riparian landowner's exclusive right to use of waters overlying his land is section 33-6-123(1), C.R.S. 1973:

"It is unlawful for any person to enter upon the privately owned land of any other person, firm, or corporation to hunt or fish without first obtaining permission from the owner or person in charge. A violation of the provisions of this section is a misdemeanor and, upon conviction thereof, shall be punished as provided in section 33-6-127."

Finally, we note that in 1977, after the incident here in controversy had occurred, the legislature clarified the meaning of the word "premises" by the enactment of section 18-4-504.5, which provides:

"As used in sections 18-4-503 and 18-4-504, 'premises' means real property, buildings, and other improvements thereon, and the stream banks and beds of any non-navigable fresh water streams flowing through such real property."

■ We hold that the public has no right to the use of waters overlying private lands for recreational purposes without the consent of the owner.

Accordingly, the judgment is affirmed.

JUSTICE GROVES and JUSTICE CARRIGAN dissent.

MR. JUSTICE GROVES dissenting:

I respectfully dissent.

The majority opinion narrowly construes *Colo. Const.* Art. XVI § 5 which reads:

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."

The narrow construction ignores the grammar and twists the sense of this provision. The provision establishes that the waters of the state are the property of the public and are dedicated to the use of the people of the state. The clause "subject to appropriation as hereinafter provided"

functions as a caveat establishing that appropriation for a beneficial use is superior to other uses. The clause in itself does not limit other uses.

At the beginning of this century, Justice Bailey in a dissenting opinion, set forth the same interpretation of the constitutional provision:
"This makes the waters of every natural stream public. They are dedicated to the use of the people, to be used by them in such manner as they see fit, subject only to one condition; that of the right of appropriation for beneficial purposes. Until the waters are appropriated and diverted from the stream, they belong to the public.
"No stronger words could have been used by the people than are used in this declaration. It is idle to say that the waters of the streams are dedicated to the public for the purpose of appropriation, because those are not the words of the constitution. It is a grant made subject to that right.
. . .
The contention that the water of a stream is dedicated to the people for the purpose of appropriating it must fall of its own weight, because, immediately upon its being appropriated, it no longer belongs to the people. The appropriated water belongs to the appropriator. If the dedication to the people was for the sole purpose of appropriation, there is no dedication. The dedication does not go into effect until the appropriation is made, and the moment it is made the water ceases to belong to the people, but becomes the property of the appropriator. So, the right does not exist until the appropriation is made, and it ceases to exist the moment the appropriation is made. It has therefore no existence at all." Dissenting opinion *Hartman v. Tresise,* 36 Colo. 146, 84 P. 685 (1906).

The constitutional language in no way supports any intent to provide for exclusive private use of public waters. If the authors had intended to provide that non-navigable streams were to be for such exclusive use (subject to appropriation), surely they could have expressed that intent more clearly then by stating that "[t]he water of *every natural stream . . .* is . . . the property of the public, and . . . dedicated to the use of the people . . . ." (Emphasis added).

Besides disagreeing with the majority's interpretation of *Colo. Const.* Art. XVI, § 6, I take issue with the proposition that *Hartman, supra,* sets any precedent which would control the outcome in this case.

*Hartman* concerned the constitutionality of a statute which purported to give the public the right to fish in any stream in the state, subject to actions for trespass for damages done to the privately owned banks of a stream. The facts of the case are not explained clearly. Nonetheless, it appears that the defendant entered the plaintiff's land to fish in a natural stream flowing there. Both the statute and the defendant's conduct concerned trespass to land. The majority in *Hartman* held only that the defendant had no right to fish in a stream whose beds and banks were privately owned and that the legislative attempt to create public easements

on private land to facilitate access to streams constituted a taking of private property without compensation. The opinion reads:

"Plaintiff owns lands bordering on both banks of natural streams. As between him and the defendant, he owns the right of fishery in their waters within his outer boundaries. As between them, plaintiff also owns the beds of the streams just as much as he owns the adjacent banks or the soil anywhere within his surface lines. It necessarily follows that defendant has no right of fishery within plaintiff's enclosure.

"But if he does, he certainly has no easement over any portion of plaintiff's property, either in the beds of the streams or the adjacent soil, for the purpose of reaching the streams. In the enjoyment of his private property plaintiff is protected, both by federal law and the state constitution, against encroachment by defendant. Neither the state nor an individual nor a corporation to whom the right of eminent domain is delegated, can take private property for public use without just compensation; much less can the state, without any compensation at all, take the private property of one, and give it to another citizen to be enjoyed by the latter for a mere private use."

No determination as to the rights to use of streams in the absence of a trespass to land was necessary. Consequently, the statements to the effect that *Colo. Const.* Art. XVI, § 6 only provides for a right of appropriation are merely *dicta*, not precedent. In his concurring opinion, Justice Gunter recognized the majority's statements as surplusage:

"I do not think it necessary in reaching this conclusion [that of the majority] to go into the important question of riparian rights, upon which the court divides."

Additionally, the majority opinion here relies heavily upon the common law rule that one who owns the surface of the land has the exclusive right to everything above it *(cujus est solum, ejus est usque ad coelum).* The doctrine allegedly was implicitly adopted in *Hartman.*

Initially, I would question whether the rights to the use of water in a state which has adopted the appropriation system should be determined by importing a doctrine formulated with reference to a different set of circumstances.

Secondly, it is not clear that *Hartman* adopted this rule. The majority opinion does not indicate precisely the basis for its belief that the doctrine was adopted in *Hartman.* However, the language that might suggest adoption of such a theory is:

". . . plaintiff also owns the beds of the streams just as much as he owns the adjacent banks or the soil anywhere within his surface lines. It necessarily follows that defendant has no right of fishery within plaintiff's enclosure."

This language could just as well mean that the court concluded that the defendant could not fish without trespassing, and that since trespassing

was forbidden, so was fishing.

Given the ambiguity, it does not appear sound to attribute a common law theory unnecessary to its result to the *Hartman* court, and then use the theory to bootstrap to a much more expansive result by declaring it to have precedential value in a case embodying significantly different facts. Nonetheless the majority does just that in the following words:

"Thus, in *Hartman, supra,* ownership of the stream bed was held to include the exclusive right of fishery in the waters flowing over it. It follows that whoever 'breaks the close' — intrudes upon the space above the surface of the land — without the permission of the owner, *whether it be for fishing or for other recreational purposes, such as floating, as in this case, commits a trespass.*" (Emphasis added.)

In sum, the constitutional language clearly dictates a result opposite to that reached by the majority. Even if the constitutional provision were deemed ambiguous, contemporary concerns with the availability of natural resources for recreation argues for a broad interpretation of the public's rights in the waters of the state, rather than reliance upon inapplicable case law and common law made irrelevant by the express adoption of a scheme of appropriation.

MR. JUSTICE CARRIGAN joins in this dissent.

MR. JUSTICE CARRIGAN dissenting:

While I wholeheartedly join in the dissenting opinion by MR. JUSTICE GROVES, I wish respectfully to add several additional reasons why I am convinced the majority opinion is wrong.

Fundamental principles of judicial policy dictate that an appellate court should not decide a constitutional issue if it need not decide such an issue to resolve a case. *Alma Motor Company v. Timkin-Detroit Axle Company,* 329 U.S. 129, 136, 67 S.Ct. 231, 234, 91 L.Ed. 128, 133 (1946); *Mountain States Beet Growers Marketing Association v. Monroe,* 84 Colo. 300, 308, 269 P. 886, 888 (1928). Although it is clear that the defendants touched their feet to the stream bed owned by the Ritschards, it is unclear why that contact alone is insufficient to uphold the trespass convictions. If the majority believes that such "footdragging" is an inadequate basis for supporting the trespass convictions, it should say so and say why. But if the touching was a trespass, that violation was ripe for a decision and should have been the only basis for a decision. All of the majority's assertions about landowners' rights to water in adjoining streams, therefore, are assertions that amount to dicta. The majority has decided a major constitutional issue of far-ranging implications but, in so doing, has decided an issue that was not ripe for consideration.

The majority reaches deep into the common law of feudal England for the principle it today imposes on modern Colorado. The principle is of such antiquity that the majority has to express it in Latin: "Cujus est

solum, ejus est usque ad coelum."[1]

A long "leap of faith" would be necessary to assume that that ancient rule had been imported into Colorado's early common law. And an even longer leap would be required to conclude that it was intended to govern the controversy at hand. But even if those leaps were made, it would seem obvious that the people of Colorado, in adopting the state constitution, repealed those principles and set forth the rule that unappropriated waters of Colorado's natural streams belong to all the people. *Colo. Const.*, Art. XVI, section 5.

Indeed, if "cujus est solum, ejus est usque ad coelum," is the law in Colorado, the majority opinion creates some serious problems for Colorado. If a landowner, for instance, has the right to all of the air flowing above his or her land, he or she also has the exclusive right to exclude others from trespassing in the airspace. Violators who infringe that airspace may be prosecuted for criminal trespass (as in this case), sued for damages or both. Anyone who floats a balloon, pilots a hang glider, flies a kite or shoots fireworks through another's airspace, therefore, is subject either to criminal prosecution, civil suit or both. Similarly and presumably, so are the owners and operators of industrial, utility and other plants which spew smoke or pollutants into the airstream and over the property of others.

Here, the "trespassers" were merely making a fleeting, nonconsumptive use of the quality of buoyancy inherent in the water. A prosecution for trespass is no more appropriate than would be such a prosecution against one making use of the buoyancy of air, as stated in the above-set-out examples.

In a larger sense, no individual "owns" the beauty or buoyancy of our streams and skies. Each drop of water which, for the moment, is part of a stream, is part of the whole earth. It may at any time evaporate and become part of a cloud. It may be snow in winter, hail in spring, rain in summer and part of a juicy melon in fall. To apply to stream water medieval concepts derived from attempts to define unlimited fee simple title defies both reason and legal history. If we must seek ancient concepts to aid in defining relative rights here, we would do better to consider the American Indians' views. They believed that all of us are caretakers and conservators of the Earth's natural beauties for the benefit of future generations. In their scheme, everyone had a right to use the Earth; no one a right to abuse it. That was the law in Colorado when the English feudal courts adopted the rule "Cujus est solum, ejus est usque ad coelum." It would be a sounder precedent for this case.

---

[1] He who owns the surface of the ground has the exclusive right to everything which is above it.

The majority opinion dramatically alters the law of Colorado as it has been perceived by the many boaters, rafters and tubers who for years have sought rest, recreation and relaxation on our beautiful streams and rivers. As our population grows, so grows the need for surcease from the cares and concerns of city dwelling. Those who in our state constitution dedicated our natural streams "to the use of the people of the state . . . ." were not elitists. *Colo. Const.*, Art. XVI, section 5. They did not reserve the enjoyment of these great natural resources to the few. Nor did they exclude from such pleasures all but the few who owned land on stream banks. If the recreational use of streams was not among those uses for which streams were reserved to the public, it is impossible to conceive what uses were contemplated and reserved by the constitution.

The Colorado Supreme Court, in rejuvenating the ancient principle of "cujus est solum, ejus est usque ad coelum," has embraced a doctrine which the United States Supreme Court long ago abandoned as obsolete. In 1946, the United States Supreme Court concluded that the doctrine, which the majority opinion today adopts, had "no place in a modern world." *United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 1065, 90 L.Ed. 1206, 1210 (1946). That court's reasoning more than thirty years ago that "[c]ommon sense revolts at the idea, . . . " has lost none of its persuasive power with the passage of time. *Id.*

The majority opinion expressly acknowledges that "it is within the competence of the General Assembly to modify rules of common law within constitutional parameters." Judicial self-restraint also requires that such a policy change be left to the elected representatives of the People, the General Assembly. Clear evidence that the legislature did not intend water flowing in a stream to be subject to trespass is apparent in its listing of real property interests which may be subject to trespass. Section 18-4-504.5, C.R.S. 1973 (1978 Repl. Vol. 8). Although "stream banks and beds" are included on the list, water in the streams is excluded from it.

If it were left to the legislature to determine whether the owner of land also was the owner of water in an adjoining stream, more opportunity would exist for practical compromise. If public use of streams for floating were to be allowed, the legislature could, by regulations and licensing, protect the privacy and property rights of adjoining landowners while preserving reasonable recreational access to waterways, thus balancing the competing interests in a manner impossible for a court reacting to appeal of a treaspass conviction.

Ironically the majority opinion, while implying that the General Assembly is competent to change the rule adopted today, has complicated the prospects of having the rule changed in the future. The Court has painted the state into a corner, and its brushwork assures that any effort to alter the rule will be difficult and expensive. The Court, by creating a vested property right in stream water (with the concomitant right to

exclude all others from that water), has created a valuable property interest. And the General Assembly, therefore, cannot give the public recreational access to rivers without taking away from landowners their newly recognized property interests and paying them "just compensation." *U. S. Const.*, Amendment V; *Colo. Const.*, Art. II, section 15.

It is difficult to imagine a more stark contrast than the disparity between the result which the majority reaches and the language and spirit of Article XIV, section 5, ("The water of every natural stream, not heretofore appropriated, within the State of Colorado, is hereby declared to be the property of the *public,* and the same is dedicated to the use of the *People* of the State, subject to appropriation as hereinafter provided." (Emphasis added)).

Eleven states west of the Mississippi River have recognized the right of public or non-owners' use of waters in river beds which are privately owned. Such rights are flourishing in California, Idaho, Iowa, Minnesota, Missouri, New Mexico, Oregon, South Dakota, Texas, Washington, and Wyoming. *See* Johnson and Austin, *Recreational Rights and Titles to Beds on Western Lakes and Streams,* 7 *Natural Resources Journal* 1, 38-40 (1967). *See also* Note, *Water Recreation — Public Use of "Private Waters,"* 52 *Calif. L. Rev.* 171 (1964). But those rights now appear to be foundering in Colorado.

As stated above, I would decide this case on narrow, non-constitutional grounds and leave the policy issues to the General Assembly.